**2021 IL 125768**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125768)

*In re* JULIE M., a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Appellee, v. Julie M., Appellant).

*Opinion filed December 16, 2021.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Theis, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke dissented, with opinion, joined by Justice Neville.

## OPINION

¶ 1    Carle Foundation Hospital (Carle) filed a petition for the emergency admission by certification of respondent, Julie M., to a mental health facility pursuant to Chapter III, article VI, of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et seq.* (West 2018)). *Id.* ch. III, art. VI.

Respondent moved to dismiss, arguing that the petition was untimely filed under sections 3-604 and 3-610. *Id.* §§ 3-604, 3-610. The Champaign County circuit court denied the motion and ordered respondent to be involuntarily committed for no more than 90 days. The appellate court found that the capable-of-repetition-yet-evading-review exception to the mootness doctrine applied and then affirmed.

¶ 2 To determine whether the petition was timely under sections 3-604 and 3-610, we must determine the precise start/stop triggers for those deadlines, whether they apply to respondent, and when respondent was admitted to a mental health facility pursuant to article VI. For the reasons that follow, we affirm.

¶ 3 BACKGROUND

¶ 4 *Respondent's Medical and Psychiatric Care*

¶ 5 Respondent arrived at Carle on September 14, 2018, via emergency medical services after swallowing batteries in an apparent suicide attempt. Members of the Carle staff were familiar with respondent because she had been treated at Carle just weeks before this incident, also for swallowing batteries. In fact, this was her third time swallowing batteries in 2018. Respondent had been previously diagnosed with multiple mental illnesses.

¶ 6 Carle does not have a psychiatric ward. Rather, it has a psychiatric team that provides for the psychiatric needs of patients housed throughout the hospital. Thus, respondent was not placed in any kind of specific mental health ward, unit, or section. Rather, she was housed on what the parties refer to generally as the "medical floor."

¶ 7 Respondent underwent an endoscopy on the day of her presentation, and one of the batteries was found in her esophagus. Another endoscopy was performed the next day, September 15, but no battery was recovered. On September 17, the psychiatric team consulted with respondent, marking the earliest instance in the record of affirmative psychiatric treatment. The psychiatric team met with respondent again on September 19. On September 20, respondent underwent a colonoscopy in an effort to remove the remaining batteries. Doctors observed severe internal damage caused by battery acid but were not able to recover the

batteries. Surgery was consulted, and on September 21, respondent underwent open surgery, which resulted in the removal of the final battery.

¶ 8        Respondent's care was comanaged by both medical and psychiatric teams. Dr. Renato Alcaraz, an internal medicine hospitalist, cared for her on the medical side during her surgical recovery while the psychiatry team, led by Dr. Benjamin Gersh, continued to see respondent regularly. Respondent's psychiatric medication was increased. Throughout her stay, respondent expressed suicidal ideations and attempted to hurt herself on several occasions. As a result, she required sitters to supervise her at all times.

¶ 9        Dr. Alcaraz believed that respondent was medically stable for discharge from a surgical standpoint on September 28. In his opinion, the wound was healing well and showed no signs of complication by that point. However, he recognized that an actual discharge would not occur until all care teams involved in a patient's case agreed. Dr. Gersh was not ready to discharge respondent on September 28. He distinguished between "medically stable for discharge" and "medically appropriate for discharge." Given that respondent had a history of swallowing foreign objects, Dr. Gersh did not feel it appropriate to discharge her while she still had medical staples in her abdomen. Furthermore, Dr. Gersh was concerned with the fact that respondent had nowhere else to go at that time because the local psychiatric facilities would not accept "medically complicated people" like respondent, no family appeared able or willing to care for her, and the only other option being considered by respondent and her mother was a homeless shelter. Dr. Alcaraz would later testify that considerations regarding where the patient would go after discharge are typical before issuing the actual discharge order, even if the patient were medically stable and had no psychiatric issues. Respondent remained in the hospital past September 28 without any discharge.

¶ 10       On October 3, her surgical staples were removed. On October 4, Dr. Gersh determined that respondent was medically appropriate for discharge. At 2 p.m., a petition for emergency admission by certification was executed by a hospital social worker. Two certificates were executed at 2:30 p.m. and 5:04 p.m., each attesting to a personal examination of respondent and concurring with the need for immediate hospitalization. The first certificate, executed by Dr. Gersh, attested to the fact that respondent "has been medically cleared today." The second certificate,

executed by Dr. Emily Buirkle, stated that respondent "was deemed medical appropriate for discharge on 10/4/2018." No actual discharge order appears to have been issued by Carle. On October 5, the petition and both certificates were filed with the circuit court at 8:24 a.m.

¶ 11                           *Circuit Court Proceedings*

¶ 12         Prior to the commitment hearing on the petition, respondent moved to dismiss the petition on the grounds that she had been detained involuntarily without petition, examination, or certificate from September 28 to October 5 in violation of sections 3-604 and 3-610 of the Mental Health Code (*id.* §§ 3-604, 3-610). According to respondent's motion, she had been medically cleared on September 28 yet remained "detained at the Facility involuntarily and refused discharge from the Facility against medical advice."[1] She argued that sections 3-604 and 3-610 require that a petition or certificate, respectively, be executed within 24 hours of her involuntary detention.

¶ 13         At the commitment hearing, the circuit court first heard testimony and argument on the motion. Dr. Alcaraz, Dr. Gersh, and two nurses testified to the facts of respondent's care. Relevant here, Dr. Gersh testified that respondent was discharged by Dr. Buirkle on October 4, marking the "end of her medical stay" and her "transition to a 'psych stay.' " The court ultimately denied the motion to dismiss:

> "The more difficult question is, whether that certification on October the 4th was timely done. The law requires that someone who's being held involuntarily must—the certificate must be filed within 24 hours. She was medically there because of a surgery to remove a battery. The surgery took place on September the 21st. She was then [seen] by Dr. Alcaraz from the 25th to the 30th. It was his opinion that she was medically stable and could be discharged, I believe he testified to, on the 28th.

---

[1]"Against medical advice" as used by Carle refers to a note in the patient's medical file. If a person with this notation in her file attempts to leave, the caregiver is to alert the person who issued the notation, who then conducts a "decisionality examination" to determine the appropriate course of action.

But, he also testified that he co-managed her care with both psychiatry and surgery. And Dr. Gersh testified, the evidence before the Court, is that Dr. Gersh testified that she was medically discharged on the 3rd—October the 3rd.[2] The question is whether she—whether prior to that discharge on October the 3rd, her legal status changed; that is, it went from being voluntarily in the hospital to involuntarily in the hospital.

And it's—it is the Respondent's burden to establish that she was involuntarily there. The testimony and the evidence in this case is that she wanted to leave the hospital, there's no question about that. But, wanting to leave the hospital, is that the same as being involuntarily in the hospital? Dr.—not Dr.—nurse practitioner Corbett testified that [respondent] wanted to leave but that she was responsive to him telling her that she wasn't—it wasn't appropriate for her to leave the hospital yet. That she needed placement before leaving the hospital. I think—I haven't seen anything that suggests, that demonstrates in the Court's mind that she's met her burden that she was involuntarily in the hospital. The fact that she didn't want to be there is true of every person, I think, in the hospital. That doesn't mean they're involuntarily there. So—and I'm basing that decision on the reading of both [*In re Linda B.*, 2017 IL 119392,] and [*In re Andrew B.*, 386 Ill. App. 3d 337 (2008)], and it's in the *Andrew B.* case that it appears the Court adopted a fairly technical definition of admission. The Court said that physical presence in a hospital or even a mental health facility does not mean that you're involuntarily there. People can be there for a variety of reasons. And it's only when that becomes involuntarily so, which in this case once she was discharged from the hospital, then she would be admitted under the—once she was medically discharged from the hospital on October 3rd, that is when the Court finds she was admitted for purposes of the Act. The certificate was filed[3] within 24 hours of that, so the motion to dismiss will be denied."

---

[2]Although the circuit court repeatedly characterized Dr. Gersh's testimony as pinpointing the date of discharge as October 3, it is clear from a review of the report of proceedings that Dr. Gersh actually testified that he believed respondent medically appropriate for discharge on October 4 and that respondent was discharged on that date by Dr. Buirkle.

[3]The circuit court referred to the certificate being "filed" within 24 hours of respondent's discharge, which—based on its misquoting of Dr. Gersh's testimony—would suggest it was filed

¶ 14 The circuit court then heard testimony on whether respondent was a person subject to involuntary admission on an inpatient basis as defined in the Mental Health Code. It ultimately held that she was and ordered her hospitalized for no more than 90 days.

¶ 15 *Appellate Court Proceedings*

¶ 16 On appeal, respondent sought reversal of the commitment order based on the untimeliness of the petition, again under sections 3-604 and 3-610. The appellate court affirmed. 2019 IL App (4th) 180753. Although the court provided an overview of the statutory framework at issue, it did not examine or discuss the deadline of section 3-610, instead focusing on the deadline of section 3-604, which it apparently viewed as being triggered by "admission." Presumably with this understanding, it held that mental health facilities must "comply with the Mental Health Code's admission procedures, even if a recipient has already been admitted to the facility for medical treatment." *Id.* ¶ 49. The court was concerned that psychiatric patients who present at a facility for purely mental health concerns would receive all the benefits of the Mental Health Code while those that present with an additional medical emergency, *e.g.*, attempted suicide, would not be entitled to those protections. *Id.* ¶ 50. It insisted that a "mental health facility cannot hide behind a 'medical care' shield to permit it to provide mental health services without the protections of the Mental Health Code and deny protections of the Mental Health Code to those patients who most need it." *Id.*

¶ 17 Moving on to whether the petition was timely, the appellate court felt bound by *In re Linda B.*, 2017 IL 119392, which it characterized as holding that "respondent carried the burden of showing her admission and treatment were involuntary" in a challenge to the timeliness of a petition. 2019 IL App (4th) 180753, ¶ 55. Noting that *Linda B.*'s analysis "regarding which party bears the burden of establishing voluntariness or involuntariness" was "concerning," it nevertheless applied that burden to respondent's case. *Id.* ¶¶ 54-55. Because respondent had not established

with the court on October 4; however, the petition and both certificates were actually filed on October 5.

- 6 -

that her "admission and treatment at Carle were involuntary," it felt bound to affirm the circuit court's judgment. *Id.* ¶ 55.

¶ 18 Respondent now appeals to this court. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). We allowed Advocate Aurora Health, *et al.*, to file an *amicus* brief. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 19                                   ANALYSIS

¶ 20                                   *Mootness*

¶ 21 "As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). Both parties agree that this appeal is moot because the underlying 90-day order of involuntary admission has expired. We agree. We may, however, review a case under an exception to the mootness doctrine. The parties argue that two such exceptions apply: the capable-of-repetition-yet-evading-review exception and the public interest exception.

¶ 22 " '[T]here is no *per se* exception to mootness that universally applies to mental health cases.' " *In re Lance H.*, 2014 IL 114899, ¶ 13 (quoting *Alfred H.H.*, 233 Ill. 2d at 355). The two elements of the capable-of-repetition-yet-evading-review exception are (1) that the duration of the challenged action must be too short to be fully litigated before its end and (2) a reasonable expectation the same complainant will again be subject to the same action. *In re Benny M.*, 2017 IL 120133, ¶¶ 19-20. The first element is met here because the allegedly defective commitment order and petition could not be fully litigated within 90 days. The second element is also met because, given respondent's history, there is a reasonable expectation that she will be subject to future emergency admissions by certification after presenting at a hospital for both medical and psychiatric care. Resolution of the legal issues concerning her admission under the Mental Health Code, the timeliness and applicability of article VI petitions, and the proper application of *Linda B.* are likely to be implicated in any future commitment proceeding involving respondent. See *Alfred H.H.*, 233 Ill. 2d at 358-60. Because this exception to mootness provides sufficient scope for our review of the questions presented, we proceed with our

analysis.

¶ 23                                    *Issues Presented*

¶ 24        Before this court, respondent does not challenge the adequacy of the evidence that she was subject to involuntary admission on an inpatient basis. Rather, she seeks reversal of the commitment order based on the untimeliness of the petition under sections 3-604 and 3-610. In making this challenge, respondent does not rely on the text of those sections or their start/stop triggers; instead, she makes a specific request that we modify the *Linda B.* burden by using the reporting requirements of section 3-202 of the Mental Health Code (405 ILCS 5/3-202 (West 2018)) as a presumption-setting and duty-imposing baseline.

¶ 25        The State asks that we uphold this court's interpretation in *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010), of the triggering event for the relevant deadline; recognize that treatment, detention, and admission are distinct terms; and hold that the deadlines of sections 3-604 and 3-610 are mandatory as to releasing a respondent from involuntary detention but are directory as to the circuit court's ability to enter an order of involuntary commitment. The State does not contest before this court that Carle qualified as a mental health facility under these facts.

¶ 26                                  *Statutory Construction*

¶ 27        Determining whether the petition for emergency admission by certification was timely under sections 3-604 and 3-610 of the Mental Health Code requires statutory construction, presenting a question of law subject to *de novo* review. *Id.* The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning. *Cooke v. Illinois State Board of Elections*, 2021 IL 125386, ¶ 52. The statute must be viewed as a whole, and as such, this court construes words and phrases not in isolation but relative to other pertinent statutory provisions. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶ 35. No part of a statute should be rendered meaningless or superfluous. *Rushton v. Department of Corrections*, 2019 IL 124552, ¶ 14.

¶ 28 We likewise keep in mind the subject addressed by the statute and the legislature's apparent intent in enacting it. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17. Here, "the provisions of the Mental Health Code reflect legislative recognition that civil commitment is a deprivation of personal liberty, and the purpose of its procedures is to provide adequate safeguards against unreasonable commitment." *Linda B.*, 2017 IL 119392, ¶ 38. Because involuntary administration of mental health services implicates fundamental liberty interests, statutes governing the applicable procedures should be construed narrowly. *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004) (citing *In re Barbara H.*, 183 Ill. 2d 482, 498 (1998)).

¶ 29                                     *Statutory Authority*

¶ 30 Chapter III of the Mental Health Code contains the painstakingly detailed admission procedures at issue and makes clear that "[a] person may be admitted as an inpatient to a mental health facility for treatment of mental illness *only* as provided in this Chapter." (Emphasis added.) 405 ILCS 5/3-200(a) (West 2018). Chapter III provides for many forms of admission: informal admission (article III (*id.* ch. III, art. III)), voluntary admission of adults (article IV (*id.* ch. III, art. IV)), admission of minors (article V (*id.* ch. III, art. V)), emergency admission by certification (article VI (*id.* ch. III, art. VI)), and admission by court order on either an inpatient or outpatient basis (articles VII and VII-A (*id.* ch. III, arts. VII, VII-A)). Generally speaking, these admissions occur prior to any specific finding by a court that the admittee meets the statutory definition of a "person subject to involuntary admission" (*id.* §§ 1-119, 1-119.1) and prior to any commitment order. A person can also be admitted pursuant to a commitment order after a hearing (article VIII (*id.* ch. III, art. VIII)). Recognizing the many ways one might be admitted, the Mental Health Code requires that mental health facilities "maintain adequate records which shall include the Section of this Chapter under which the recipient was admitted, any subsequent change in the recipient's status, and requisite documentation for such admission and status." *Id.* § 3-202(a).

¶ 31 Article VI, at issue here, provides for the involuntary admission of a respondent in an emergency situation where she is in need of immediate hospitalization to protect herself or others: "A person 18 years of age or older who is subject to

- 9 -

involuntary admission on an inpatient basis and in need of immediate hospitalization may be admitted to a mental health facility pursuant to this Article." *Id.* § 3-600. Pursuant to article VI, anyone 18 years or older may present a petition to the facility director of a mental health facility asserting that the respondent is a person subject to involuntary admission on an inpatient basis and in need of immediate hospitalization. *Id.* § 3-601(a). "The petition shall be accompanied by a certificate," executed by a physician, qualified examiner,[4] psychiatrist, or clinical psychologist (collectively, qualified professional). *Id.* § 3-602. The certificate must indicate that the respondent was personally examined no more than 72 hours prior to admission, state that the respondent is a person subject to involuntary admission on an inpatient basis and in need of immediate hospitalization, contain the factual basis for diagnosis, and include a statement as to whether the respondent was advised of certain rights. *Id.*

¶ 32    Article VI also provides for the situation in which no qualified professional is on hand to conduct an examination and execute a certificate:

"If no [qualified professional] is immediately available or it is not possible after a diligent effort to obtain the certificate provided for in Section 3-602, the respondent may be detained for examination in a mental health facility upon presentation of the petition alone pending the obtaining of such a certificate." *Id.* § 3-603(a).

However, "[n]o person detained for examination under this Article on the basis of a petition alone may be held for more than 24 hours unless within that period a certificate is furnished to or by the mental health facility. If no certificate is furnished, the respondent shall be released forthwith." *Id.* § 3-604.

¶ 33    Within 24 hours of "admission under this Article [VI]," the facility director must file with the circuit court (1) the petition, (2) the first certificate, and (3) proof of service of the petition and a statement of rights on the respondent. *Id.* § 3-611. Also within 24 hours of "admission of a respondent pursuant to this Article [VI]," a second examination and certificate must be executed. *Id.* § 3-610. Upon

---

[4]A "qualified examiner" is defined in the Mental Health Code as an appropriately qualified clinical social worker, registered nurse, licensed clinical professional counselor, or licensed marriage and family therapist. 405 ILCS 5/1-122 (West 2018).

completion of the second certificate, the facility director is required to "promptly file" it with the court along with the other materials previously filed. *Id.* § 3-611.

¶ 34    Once the petition and two certificates have been filed in the circuit court, the matter proceeds to a hearing pursuant to article VIII (*id.* ch. III, art. VIII). There, the court makes a number of findings and determinations, including whether the respondent is a person "subject to involuntary admission on an inpatient basis." *Id.* § 3-811. If so, the court may issue a commitment order not to exceed 90 days. *Id.* §§ 3-811(a), 813(a).

¶ 35                          *Section 3-610's Start/Stop Triggers*

¶ 36    Respondent's first challenge of untimeliness concerns the 24-hour deadline found in section 3-610. That section reads, in relevant part, as follows:

> "As soon as possible but *not later than 24 hours*, excluding Saturdays, Sundays and holidays, *after admission of a respondent pursuant to this Article,* the *respondent shall be examined by a psychiatrist*. The psychiatrist may be a member of the staff of the facility *but shall not be the person who executed the first certificate*. *** If, as a result of this second examination, a certificate is executed, the certificate shall be promptly filed with the court. If the certificate states that the respondent is subject to involuntary admission but not in need of immediate hospitalization, the respondent may remain in his or her place of residence pending a hearing on the petition unless he or she voluntarily agrees to inpatient treatment. *If the respondent is not examined or if the [qualified professional] does not execute a certificate pursuant to Section 3-602, the respondent shall be released forthwith*." (Emphases added.) *Id.* § 3-610.

¶ 37    From the plain language of section 3-610, the 24-hour deadline begins at "admission of a respondent pursuant to this Article" and ends with the execution—not filing—of a second examination and certificate. If the respondent is not examined by this second qualified professional or if the qualified professional does not execute a second certificate pursuant to section 3-602, then "the respondent shall be released forthwith." *Id.* This section does not, contrary to respondent's assertion, require that a petition be executed or filed within 24 hours of detention.

- 11 -

¶ 38    There is no dispute here about the sufficiency of the petition, examinations, or certificates themselves. Nor is there any dispute that the second certificate was executed at 5:04 p.m. on October 4 and filed at 8:24 a.m. on October 5, along with the petition and first certificate. The central dispute arising under this section concerns when respondent was admitted pursuant to article VI.

¶ 39                                    *Admission*

¶ 40    Respondent has offered a number of alternative arguments as to when she was "admitted." In her original motion to dismiss, she argued she was admitted on September 28, the date Dr. Alcaraz opined that she was medically stable for discharge. On appeal and before this court, she argues that she was admitted on September 14, the date she presented at the hospital for attempted-suicide-by-battery-swallowing because her case "was always a mental health case." Alternatively, respondent argues she was admitted no later than September 17, the earliest date supported by the record on which psychiatric treatment was affirmatively rendered.

¶ 41    As the State points out, these arguments misapprehend the issue. The question is not when respondent was "admitted" in a colloquial or physical sense but when she was "admitted pursuant to article VI." We examined this question in *Andrew B.*, 237 Ill. 2d 340. There, the respondent voluntarily admitted himself to the facility pursuant to article IV but later expressed a desire to leave. *Id.* at 343. Rather than discharge him, the facility petitioned for the respondent's involuntary admission pursuant to article IV, specifically under sections 3-403 and 3-404 (405 ILCS 5/3-403, 3-404 (West 2006)).[5] *Andrew B.*, 237 Ill. 2d at 343. Although the circuit court ordered the respondent discharged, the facility instead filed a new petition for involuntary admission, this time pursuant to article VI under section 3-600 (405 ILCS 5/3-600 (West 2006)). Again, the court ordered the respondent discharged, but the facility filed yet another petition pursuant to article VI under section 3-600. *Andrew B.*, 237 Ill. 2d at 343. The court ultimately found the respondent subject to involuntary admission on an inpatient basis and ordered him to be committed. *Id.*

---

[5]These sections require the facility to regularly review the recipient's voluntary status and to discharge a voluntary recipient upon her request unless a petition and two certificates conforming to sections 3-601 and 3-602 are filed with the court.

at 345. Before this court, the respondent argued that the last petition filed was untimely under section 3-611 (405 ILCS 5/3-611 (West 2006)) since he had been physically admitted to the facility months before. *Andrew B.*, 237 Ill. 2d at 345.

¶ 42        We held the petition timely. *Id.* at 351. We first noted that section 3-611's 24-hour filing deadline was triggered by an individual's admission under article VI and that the respondent had not been admitted pursuant to article VI when he first arrived at the facility. *Id.* at 349-50. Consequently, section 3-611's deadline was inapplicable to his original entry. *Id.* We went on to explain that the respondent's construction of the term "admission" as referring only to physical entry into the facility was inconsistent with the Mental Health Code. *Id.* at 350. We explained that the Mental Health Code refers to admission in a legal sense to describe the individual's legal status. *Id.* Thus, admission "consists of a combination of the person's susceptibility to being detained and his actual detention." *Id.* In other words, "admission" is not always limited to physical entry. *Id.* We concluded:

        "When, as here, the individual is physically present in a mental-health facility and requires additional care and treatment following entry of a discharge order, section 3-611's 24-hour filing period logically begins when a new petition is presented to the facility director, as opposed to the date of his original physical entry into the facility." *Id.* at 350-51.

¶ 43        Framed this way, the analysis becomes clearer. The trigger for the deadline in section 3-611 ("Within 24 hours *** after the respondent's admission under this Article") is the same as the trigger in section 3-610 ("not later than 24 hours *** after admission of a respondent pursuant to this Article"). See 405 ILCS 5/3-610, 3-611 (West 2018)). A person may be admitted as an inpatient to a mental health facility for treatment of a mental illness *only* as provided in Chapter III. *Id.* § 3-200(a). Each article within Chapter III contains a number of necessary conditions that must be met for the legal status of "admitted as provided in Chapter III" to attach. For instance, pursuant to article III, a person may be "informally admitted" upon request if, after examination, the facility director considers that person clinically suitable for informal admission. *Id.* § 3-300. Pursuant to article IV, a person may be "voluntarily admitted" upon filing of a written application with the facility director if the facility director determines and documents that the person is clinically suitable for voluntary admission and has the capacity to consent to such

- 13 -

admission. *Id.* §§ 3-400(a), 3-401(b). Pursuant to article VII, a person may be involuntarily admitted by court order for the purpose of completing the requisite examinations and certificates needed to advance the proceedings to the commitment hearing. *Id.* § 3-704(a). Until these conditions are met, a person cannot be said to be admitted "as provided in Chapter III" nor pursuant to the relevant article.

¶ 44    Turning to the article VI admission at issue in this case, the statutory conditions that must be met for the legal status of "emergency admission by certificate pursuant to article VI" to attach are, as in *Andrew B.*, a petition and certificate presented to the facility director. *Id.* §§ 3-600 (stating that a person may be admitted to a mental health facility "pursuant to this Article"), 3-601 (requiring the presentation of a petition to the facility director), 3-602 (requiring that a certificate accompany the petition); *Andrew B.*, 237 Ill. 2d at 350-51. Although *Andrew B.*'s analysis was conducted in the context of a change in a recipient's legal status from "admitted pursuant to one section of the Mental Health Code" to another, that analysis applies here where the recipient's status is changing from "not admitted under the Mental Health Code" to "admitted under the Mental Health Code." Until the petition and certificate are properly executed, no admission has occurred, and therefore any prior treatment or detention cannot be legally supported by an emergency admission by certification. Treatment rendered after completion of a certificate, on the other hand, is specifically authorized. 405 ILCS 5/3-608 (2018).

¶ 45    Lastly, we note that these two necessary conditions (petition and certificate) are not always sufficient to constitute a legal admission pursuant to article VI. As we illustrated in *Andrew B.*, the determination may take into account other facts, including the physical presence of the respondent, any previous treatment, and any change in legal status prior to the admission at issue. *Andrew B.*, 237 Ill. 2d at 350-51. These facts may belie or support a finding of admission in certain circumstances. The bottom line, however, is that, until the petition and certificate are properly executed, no legal admission under article VI has occurred.

¶ 46                    *Respondent's Arguments and* Linda B.

¶ 47    Respondent argues that this holding strips recipients of the protections afforded by the Mental Health Code and allows the facility to determine when—and if—

those protections apply. She argues that, under this holding, a person could be treated without being admitted, thus losing the protections of the Mental Health Code. Similarly, she argues that facilities could indefinitely treat someone until such time as they deem it convenient or desirable to initiate proper admission proceedings.

¶ 48    To prevent this, respondent asks us to equate "treatment" and/or "detention" with "admission" and hold that any treatment or detention constitutes an admission in some form. Furthermore, respondent argues that it should be the facility's burden to show the recipient's admission status pursuant to the record-keeping requirements of section 3-202. If the facility cannot meet this burden by producing these records, then the recipient must be legally and automatically deemed "involuntarily admitted," or in the alternative, the person must be deemed admitted under the section that most closely resembles the facts of the recipient's situation. Thus, respondent argues here that she was involuntarily admitted on the day she presented at the facility for attempted suicide, a mental health concern, because the facility has not shown otherwise—or in the alternative, because the facts of respondent's situation most closely resemble an "involuntary admission" and should therefore be designated as such. In making this argument, respondent asks us to modify the holding of *Linda B.*, which she and the lower courts mischaracterized as standing for the proposition that a respondent carries the burden of persuasion in the circuit court of showing her admission was involuntary to prevail on a motion to dismiss a petition on the basis of untimeliness.

¶ 49    These largely policy-based arguments fail on several legal fronts. First, the text of the Mental Health Code repeatedly distinguishes between admission, treatment, and detention. A recipient is "a person who has received or is receiving treatment or habilitation."[6] 405 ILCS 5/1-123 (West 2018). "Treatment" is defined as "an effort to accomplish an improvement in the mental condition or related behavior of a recipient." *Id.* § 1-128. "Treatment includes, but is not limited to, hospitalization, partial hospitalization, outpatient services, examination, diagnosis, evaluation, care, training, psychotherapy, pharmaceuticals, and other services provided for recipients by mental health facilities." *Id.* Relatedly, " '[h]ospitalization' means the

---

[6]"Habilitation" is any effort directed toward the alleviation of a developmental disability and is not at issue here. 405 ILCS 5/1-111 (West 2018).

treatment of a person by a mental health facility as an inpatient." *Id.* § 1-112. Although "admission" is not expressly defined, it is carefully prescribed by the detailed procedures outlined in Chapter III, as explained above, and is repeatedly used to connote one's legal status as opposed to one's physical status, as we explained in *Andrew B.* Equating the term admission with any one of these other terms would render it superfluous and without meaning.

¶ 50    Under respondent's reading, any effort to improve a person's mental condition, such as by examining a person's mental state while in the hospital, qualifies as an "admission to a mental health facility." There is no indication that the legislature intended such a result. Rather, the legislature specifically delineated when an admission occurs, no doubt to carefully cabin the social, professional, and legal consequences that flow from being involuntarily admitted to a mental health facility. Nor is there any indication from the text of the statute itself that the legislature intended to require that a person's legal status change to "admitted to mental health facility" before she could legally receive any mental health treatment of any kind. On the contrary, every indication from the statutory scheme suggests that the legislature intentionally decoupled these concepts for the protection of both recipients and facilities.

¶ 51    Likewise, involuntary detention, involuntary treatment, and involuntary admission are all distinct terms with different legal meanings. Although they are certainly related, even so far as being triggered by the same act in certain situations, the legislature carefully distinguished these concepts throughout the Mental Health Code. For instance, section 3-607 illustrates that a person could be involuntarily detained but not involuntarily admitted. *Id.* § 3-607 (authorizing a court-ordered detention for the purpose of examination and providing that the person may be admitted upon execution of a petition and certificate). Or a person could be involuntarily treated without being involuntarily admitted, such as where a facility renders involuntary treatment but fails to follow the proper admission procedures of the Mental Health Code.

¶ 52    Second, respondent's argument that failing to equate treatment with admission will strip recipients of the Mental Health Code's protections overlooks the overwhelming amount of protections in place for all *recipients* of mental health treatment, regardless of their admission status. Chapter II of the Mental Health

Code extensively outlines a number of these express rights and protections. *Id.* ch. II.

¶ 53     Furthermore, all recipients, regardless of admission status, are protected by constitutional guarantees, generally applicable statutes, and the common law for any deprivation of rights or tortious conduct. If a facility involuntarily detains or treats a person while that person is not legally admitted pursuant to Chapter III, then that facility will be without any legal basis under Chapter III for its actions, subjecting it to potential legal action and liability under the appropriate legal theory.

¶ 54     It is true, as the appellate court noted, that there are certain protections afforded only to admittees and, therefore, a recipient could be deprived of those admission-specific protections if the facility fails to properly admit her. To this, we first note that the fact of differing protections for recipients and admittees underscores the legislative recognition that these two concepts are distinct. We also observe that these protections are carefully crafted to protect both the recipient and the facility. They protect the recipient by ensuring that the legal classification of "involuntarily admitted" is properly attached to the recipient, that the legal bases for detention and treatment are carefully limited, and that the commitment process is expeditiously resolved. They protect the facility by outlining the precise steps it must take to avail itself of the legal protections afforded a properly executed admission under the Mental Health Code. When viewed in this light, it becomes clear that the protections do not flow one way and that, if the facility fails to follow the admission procedures, thereby depriving the recipient of the admission-specific protections, then it, too, is bereft of any legal protection for its detention and/or treatment of the recipient. Furthermore, if the facility fails to properly admit the recipient, then she is free from the legal classification of being involuntarily admitted. In the end, the recipient is able to vindicate her admission-specific rights in one way or another. In no circumstance, however, is she bereft of protection under the Mental Health Code.

¶ 55     Third, respondent's proposed methodology for determining a person's automatic admission status by producing the facility's records under section 3-202 seeks to impose duties and requirements contrary to the Mental Health Code. Section 3-202's record-keeping requirement does not require the facility to admit every person receiving treatment nor to inquire of every person receiving mental

- 17 -

health treatment whether they desire informal, voluntary, or some other type of admission. It only requires that mental health facilities "maintain adequate records which shall include the Section of this Chapter under which the recipient was admitted, any subsequent change in the recipient's status, and requisite documentation for such admission and status." *Id.* § 3-202(a). Thus, if there is an admission pursuant to Chapter III, then the facility must properly document it.

¶ 56 Likewise, respondent argues that, if no record is presented by the facility showing the recipient's admission status, then that "admission" should be deemed "involuntary," but she does not specify which type of involuntary admission would result. As has been made clear, an "involuntary admission" is not a specific type of admission authorized by Chapter III. Rather, it is a category type that includes specific types of admissions, each with their own admission procedures. Legally deeming a person with a blanket status of "involuntarily admitted" does not adequately explain under which article or section of the Mental Health Code that person would be designated and processed. The Mental Health Code obviates the need for this guesswork by specifying the necessary conditions for each specific type of admission.

¶ 57 Lastly, respondent and the lower courts have misconstrued *Linda B.*, 2017 IL 119392. The central holding of *Linda B.* was that any facility, or any part of a facility, that provides psychiatric treatment to a person with a mental illness qualifies as a mental health facility under the Mental Health Code. *Id.* ¶ 37. The second holding, at issue here, was much narrower and merely applied settled law that the appellant bears the burden of presenting a sufficiently complete record to support a claim of error. *Id.* ¶ 43.

¶ 58 There, the respondent presented to the hospital under unknown circumstances. *Id.* ¶ 3. After two weeks of receiving medical and mental health care on the "medical floor," the facility director filed a petition for the emergency admission by certification of the respondent, supported by two certificates. *Id.* ¶¶ 3-4. At the commitment hearing, the circuit court heard evidence on the petition. *Id.* ¶¶ 5-9. After the State rested, the respondent made a motion to dismiss the petition for untimeliness " 'based upon the petition having been filed well beyond the 24 hours after [the respondent's] admission.' " *Id.* ¶ 10. Over the respondent's objection, the court allowed the State to reopen its case and present evidence related to the motion.

*Id.* ¶ 11. The State presented testimony that the hospital routinely provided psychiatric treatment to patients on the medical floor and that it did not initiate petitions for involuntary admission unless it determined that such an admission was necessary. *Id.* The court ultimately denied the respondent's motion to dismiss the petition and entered a commitment order for 90 days. *Id.* ¶ 13.

¶ 59 We first addressed the central question of whether the hospital floor qualified as a mental health facility. *Id.* ¶¶ 29-39. We held that any facility, or any part of a facility, that provides psychiatric treatment to a person with a mental illness qualifies as a mental health facility under the Mental Health Code. *Id.* ¶ 37. Thus, the medical floor of the hospital in *Linda B.* was subject to the Mental Health Code's provisions despite the fact that it was not a dedicated psychiatric ward or unit. *Id.*

¶ 60 We then presented the second question posed by the respondent—namely, when did admission occur for purposes of article VI deadlines—but we did not squarely answer that question. *Id.* ¶¶ 39-49. Instead, we focused on a more fundamental problem: there was no evidence in the record to support the respondent's argument. *Id.* ¶¶ 40-43. The respondent hinged her entire argument on the fact that she had been involuntarily treated and detained from the moment of her presentation at the hospital, and she had therefore been admitted on that date. Since the petition was over two weeks later, she argued it was untimely.

¶ 61 We did not engage in an analysis of when admission occurs, as we have done here. Rather, we examined the facts related to her alleged involuntary treatment/detention, holding that, where a litigant makes a claim of error predicated on certain facts, the litigant carries the burden on appeal of presenting a sufficiently complete record of the proceedings at trial to support her argument and attendant claim of error. *Id.* ¶ 43. In reviewing the record, we repeatedly noted the absence of evidence on this point. *Id.* ¶¶ 35, 40-42. We were left with "bare-bones evidence of physical admission to the hospital, with some evidence of communication between hospital personnel and unidentified family members of respondent." *Id.* ¶ 42. We noted that the respondent herself consciously chose not to include in the record the very facts upon which she relied for her argument about when admission occurs. *Id.* ¶ 44. Applying settled law, we resolved the doubts left by the incompleteness of the record against the appellant who relied on those very doubts.

*Id.* ¶ 43 (citing *Flynn v. Vancil*, 41 Ill. 2d 236, 241 (1968) (it is well established that, on appeal, the party claiming error has the burden of showing any irregularities that would justify reversal) and *Williams v. BNSF Ry. Co.*, 2015 IL 117444, ¶ 31 (it is the appellant's burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and any doubts that may arise from the incompleteness of the record will be resolved against the appellant)).

¶ 62        Nor was the respondent able to pinpoint any change in her legal status under the Mental Health Code throughout her hospital stay such that *Andrew B.* might have supported her argument. *Id.* ¶¶ 45-49. In fact, she essentially argued that her legal status had *never* changed while at the facility by arguing that she had been admitted under the Mental Health Code at the time of her presentation to the facility. Regardless, the record did not reflect an admission pursuant to one article of the Mental Health Code and then a second admission pursuant to some other article. Thus, her argument lacked the evidentiary foundation necessary for further review, and she could not demonstrate on appeal that any error had occurred based on those grounds.

¶ 63        Throughout these proceedings, the second holding of *Linda B.* has been invoked to stand for the proposition that, to prevail on a motion to dismiss for untimeliness, a respondent bears the burden of proof in the circuit court of showing (1) her admission status, (2) that the admission procedures were properly followed, and (3) that her detention and/or treatment were involuntary. It has also been used to support the proposition that a recipient's volition is dispositive on the question of admission. The second holding of *Linda B.* does not stand for any of these propositions. Rather, it stands for the proposition that, where an appellant makes a claim of error predicated on certain facts, any doubt in the record concerning those facts will be held against the appellant.

¶ 64        Here, the lower courts improperly applied their interpretation of *Linda B.* to the distinguishable procedural posture and argumentative stance of this case. *Linda B.*'s application to this case extends only to the holding that Carle qualifies as a mental health facility under the facts here and that the Mental Health Code therefore applies to it.

¶ 65                *Timeliness of the Petition Pursuant to Section 3-610*

¶ 66        With the above in place, we may resolve the ultimate issues of timeliness. As previously stated, the 24-hour deadline of section 3-610 referred to by respondent begins at "admission of a respondent pursuant to this Article" (405 ILCS 5/3-610 (West 2018)) and ends with a second examination and certificate executed pursuant to section 3-602 (*id* § 3-602).

¶ 67        Here, respondent presented to Carle via emergency services for immediate medical treatment following a suicide attempt. Upon her presentation, none of the admission procedures found in Chapter III were executed; therefore, she was not admitted pursuant to any article of Chapter III at that time. Respondent received medical and psychiatric treatment while physically present at the facility. After her surgical staples were removed on October 3 and after being medically cleared on October 4, respondent required additional mental health, but not medical, treatment. Also on October 4, a petition and certificate were executed to that end. Respondent has made no challenge before this court related to the sufficiency or propriety of the petition or certificates. Given these conditions, respondent was admitted pursuant to article VI on October 4 at the time the petition and first certificate were properly executed. Section 3-610's 24-hour deadline to secure a second examination and certificate began at that time. Because a second examination and certificate were completed within hours of the petition and first certificate, the 24-hour deadline of section 3-610 was satisfied.

¶ 68        For the sake of completeness, section 3-610 also requires that the second certificate be "promptly filed with the court." *Id.* § 3-610. The second certificate, executed at 5:04 p.m. on October 4, was promptly filed because it was filed the very next morning, at 8:24 a.m. on October 5, along with the petition and first certificate.

¶ 69                *Timeliness of the Petition Pursuant to Section 3-604*

¶ 70        Respondent also asserts the petition is untimely under section 3-604. In making this challenge, respondent has consistently conflated the deadlines of sections 3-604 and 3-610, making no distinction between their start/stop triggers or their

- 21 -

applicability to this case. The circuit court appears to have done likewise. Regardless, section 3-604 and its deadline are inapplicable to this case.

¶ 71    Pursuant to article VI,

"[i]f no [qualified professional] is immediately available or it is not possible after a diligent effort to obtain the certificate provided for in Section 3-602, the respondent may be detained for examination in a mental health facility upon presentation of the petition alone pending the obtaining of such a certificate." *Id.* § 3-603(a).

To effectuate such a detention, the petition must conform to the requirements of section 3-602 (*id.* § 3-602) but must further specify, essentially, that no qualified professional is on hand to execute a certificate (*id.* § 3-603(b)). "No person detained for examination under this Article on the basis of a petition alone may be held for more than 24 hours unless within that period a certificate is furnished to or by the mental health facility. If no certificate is furnished, the respondent shall be released forthwith." *Id.* § 3-604.

¶ 72    These sections do not relate to an admission. Rather, these sections provide for the emergency detention of a respondent based only on the petition until a certificate can be executed, at which time admission under article VI may occur.

¶ 73    The circuit court mistakenly believed that "The law requires that someone who's being held involuntarily must—the certificate must be filed within 24 hours." From the plain language of sections 3-603 and 3-604, however, the 24-hour deadline of section 3-604 is not triggered by a "detention" but from a "detention under this Article on the basis of a petition alone." Furthermore, section 3-604 does not require the certificate to be "filed" but rather that it be "furnished to or by the mental health facility."

¶ 74    Here, Carle never purported to detain respondent on the basis of a petition alone. Even if it did, the petition submitted by Carle did not contain the required allegations required by section 3-603. Nor did respondent ever allege that she was detained on the basis of a petition alone. In fact, respondent specifically alleged in her original motion to dismiss that she had been detained without a petition. Throughout these proceedings, respondent has made a general allegation of

detention beginning alternatively on September 28, September 17, or September 14. None of these alleged detentions were ever based upon a petition. Consequently, the deadline of section 3-604 does not apply to this case.

¶ 75 This court is not bound by the appellate court's reasoning and may affirm on any basis presented in the record. *People v. Williams*, 2016 IL 118375, ¶ 33. We apply that principle here. Having resolved the case on the grounds above, we do not address to what extent the deadlines of sections 3-610 and/or 3-604 are directory rather than mandatory as argued by the State.

¶ 76                                  CONCLUSION

¶ 77 The 24-hour deadline of section 3-610 starts upon admission of a respondent pursuant to article VI and ends with the proper execution of a second examination and certificate. Admission under article VI occurs no sooner than when the petition and first certificate are properly executed. The 24-hour deadline of section 3-604 starts upon detention based on a petition alone and ends when a certificate is furnished to or by the facility. Accordingly, the judgment of the appellate court, which affirmed the judgment of the circuit court, is affirmed.

¶ 78 Judgments affirmed.

¶ 79 CHIEF JUSTICE ANNE M. BURKE, dissenting:

¶ 80 In this appeal, respondent Julie M. contends that the petition seeking her immediate, involuntary admission for inpatient psychiatric treatment pursuant to Chapter III, article VI, of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/ch. III, art. VI (West 2018) (Emergency Admission by Certification)) was not timely filed. The majority holds that the petition filed by Carle Foundation Hospital (Carle) was timely filed, based on its finding that throughout respondent's stay at Carle—from the time respondent arrived at the Carle emergency room on September 14, 2018, for having swallowed batteries, until Carle filed the petition and accompanying certificates in the circuit court on October 5, 2018—respondent's legal status was "not admitted under the

- 23 -

Mental Health Code." This is so, according to the majority, despite the fact that Carle is a "mental health facility" within the meaning of the Mental Health Code and respondent was receiving mental health treatment—including 24-hour supervision and the administration of psychotropic medication—throughout her stay at Carle.

¶ 81    The majority offers no explanation for its holding that respondent was "not admitted under the Mental Health Code" other than the fact that, until October 4, 2018, no petition was ever filed by Carle seeking her admittance. The consequences of the majority's holding, however, are all too clear: by holding that respondent was "not admitted under the Mental Health Code" until a petition and certificates were filed by Carle, respondent's legal status under the Mental Health Code and, thereby, her rights and protections afforded by the Mental Health Code, are left solely within the discretion of Carle. Under the majority opinion, a petition for involuntary admission will *never* be untimely as long as it is filed in accordance with requirements set forth in sections 3-610 and 3-611 of the Mental Health Code (*id.* §§ 3-610, 3-611). This cannot be correct.

¶ 82    In my view, the majority's holding affords the mental health facility far too much discretion and completely denies respondent and others similarly situated the rights and safeguards to which they are entitled under the Mental Health Code. Accordingly, I respectfully dissent.


¶ 83                                BACKGROUND

¶ 84    On September 14, 2018, respondent Julie M. was transported by ambulance to Carle after she swallowed batteries in an apparent suicide attempt. She was admitted to Carle, and on the same day, an endoscopy was performed, during which one of three batteries was located and removed from her esophagus. Respondent continued to receive medical treatment for the removal of two additional batteries, including a colonoscopy on September 20 (which revealed serious injury to her intestines) and surgery on September 21, 2018, for the removal of the batteries.

¶ 85    On September 28, 2018, the medical-surgical team determined that, although respondent still had surgical staples in place, she was "medically stable" and capable of being released to a suitable location. On that same day, respondent

expressed a desire to leave Carle and refused to cooperate with treatment. Possible arrangements for her release were explored. However, respondent had no home to go to—she and her mother were homeless, and release to a homeless shelter, as her mother suggested, was not appropriate because a shelter was not equipped to provide the aftercare and supervision respondent required. As a result, respondent remained at Carle. No petition for involuntary admission was filed at this time.

¶ 86 On October 3, 2018, respondent's surgical staples were removed. Because respondent's mental health treatment team at Carle believed that respondent needed additional care and treatment for her mental illness, a petition and two certificates were presented to Carle's facility director on October 4, 2018, seeking respondent's involuntary admission for inpatient psychiatric treatment. These documents were filed with the court the following day, on October 5, 2018.

¶ 87 Prior to the commitment hearing, respondent filed a motion alleging that the petition filed by Carle was untimely. The motion asked the court to deny Carle's commitment petition and immediately release respondent. On October 18, 2018, the court held a hearing on respondent's motion immediately prior to the commitment hearing.

¶ 88 At the hearing on the motion, testimony from Dr. Gersh, Carle's resident psychiatrist, and Joseph Corbett, a nurse practitioner who directly provided respondent's mental health treatment, established that, when respondent presented at the Carle emergency room on September 14, it was well known that she suffered from multiple mental illnesses and was prone to swallowing foreign objects. In fact, Dr. Gersh testified that he had seen respondent in April 2018, when she was admitted to Pavilion mental health facility for swallowing batteries. Dr. Gersh was also aware that respondent had been admitted to Carle on August 29, 2018, only weeks prior to her present admission, for swallowing batteries. At that time, respondent stayed at Carle until September 7, 2018, at which time she was transferred to a traditional mental health facility pursuant to a petition filed under article VI of Chapter III of the Mental Health Code (*id.* ch. III, art. VI). She was released from the mental health facility on September 10, 2018, only to reappear at Carle four days later, on September 14, 2018.

¶ 89 Because Carle has no dedicated psychiatric unit, respondent was placed on a medical floor where she received both medical and psychiatric treatment. She was

placed under 24-hour observation, and her room was stripped of small objects to ensure that she did not attempt to swallow them. For the same reason, treating physicians and staff were not permitted to wear badges or carry pens into the room.

¶ 90 On September 17, 2018, respondent had her first psychiatric consultation with nurse practitioner Joseph Corbett, under the supervision of Dr. Gersh. Corbett testified at the hearing that he was familiar with respondent from her earlier stay at Carle. Corbett also testified that respondent expressed a desire to leave Carle on September 28, after she learned her medical-surgical team believed her to be "medically stable" for discharge to a suitable location. Corbett also testified that respondent became angry, ordered him out of her room, and was noncompliant with treatment. Later, he was able to speak to her and convinced her that she needed to remain at Carle for her own safety.

¶ 91 As noted above, Carle was aware of respondent's desire to leave and began to explore other possible arrangements. However, respondent was homeless and could not be released to a homeless shelter. Neither she nor her mother had any other suggestions of a suitable place to which she could go.

¶ 92 Dr. Gersh testified that admission to a traditional mental health facility was not sought on September 28, 2018, because even traditional mental health facilities would not be equipped to provide the medical care respondent required. In addition, Dr. Gersh testified at the hearing on respondent's motion that, due to respondent's propensity to swallow foreign objects, he did not want to release respondent while she still had metal staples in her abdomen from the surgery. He further testified that, because respondent came into the hospital for attempted suicide, respondent's medical team was aware that she had an "against medical advice" or "AMA" designation on her chart, which meant that she could not be discharged from the hospital without obtaining approval from the doctor entering that designation.

¶ 93 According to Dr. Gersh, he completed the petition and first certificate seeking respondent's involuntary admission to an inpatient mental health facility on October 4, 2018, after he learned from the medical team that the staples had been removed from respondent's abdomen. According to Dr. Gersh, this was when her medical stay at Carle ended and her psychiatric stay began. Dr. Gersh filed the petition because he believed respondent was a person in need of additional inpatient care.

¶ 94        After the circuit court denied respondent's motion, the commitment hearing was held. The court heard additional testimony from Dr. Gersh, Joseph Corbett, and others, then found respondent to be a person subject to involuntary inpatient treatment at a medical facility. Although the petition was granted, respondent remained at Carle until November 9, 2018, when a bed became available at McFarland Mental Health Center.

¶ 95        Respondent appealed, and the appellate court affirmed. 2019 IL App (4th) 180753. The appellate court held that mental health facilities must "comply with the Mental Health Code's admission procedures, even if a recipient has already been admitted to the facility for medical treatment." *Id.* ¶ 49. The court also held that a hospital, when acting as a mental health facility, should not be permitted to hide behind a " 'medical care' shield," to treat patients who present to a hospital with both medical and psychological problems differently from those who present at a traditional mental health facility for purely mental health concerns. *Id.* ¶ 50. Nonetheless, the court felt compelled to affirm based on our decision in *In re Linda B.*, 2017 IL 119392, in which we had held that it was the respondent's burden to show his or her initial entrance into the hospital and subsequent treatment were involuntary. This appeal followed.

¶ 96                                ANALYSIS

¶ 97        In this case, respondent does not dispute the sufficiency of the petition or the certificates filed with the court. Nor does she dispute that these documents were timely filed with the court on October 5, within 24 hours of their submission to the facility director of the hospital. Respondent's contention is that the petition was untimely because it should have been filed earlier. She asserts that she was "admitted" to a mental health facility within the meaning of the Mental Health Code at the time of her admission to the hospital and, therefore, Carle had an obligation to identify and document the provision under which she was admitted for inpatient treatment, as well as any subsequent change in her legal status.

¶ 98        The majority recognizes that the Mental Health Code provides that "[a] person may be admitted as an inpatient to a mental health facility for treatment of mental illness *only* as provided in this Chapter" (emphasis added) (405 ILCS 5/3-200(a) (West 2018)) and that Chapter III provides for many forms of admission: informal

- 27 -

admission (article III (*id.* ch. III, art. III)), voluntary admission of adults (article IV (*id.* ch. III, art. IV)), admission of minors (article V (*id.* ch. III, art. V)), emergency admission by certification (article VI (*id.* ch. III, art. VI)), and admission by court order on either an inpatient or outpatient basis (articles VII and VII-A (*id.* ch. III, arts. VII, VII-A)). *Supra* ¶ 30. In addition, the majority concedes that "the Mental Health Code requires that mental health facilities 'maintain adequate records which shall include the Section of this Chapter under which the recipient was admitted, any subsequent change in the recipient's status, and requisite documentation for such admission and status.' " *Supra* ¶ 30 (quoting 405 ILCS 5/3-202(a) (West 2018)). However, the majority finds that respondent was "not admitted under the Mental Health Code" until Dr. Gersh chose to submit the petition and certificates to the facility director and they were filed with the court in compliance with article VI of Chapter III of the Mental Health Code. I disagree.

¶ 99    In *Linda B.*, 2017 IL 119392, ¶ 37, we held: "In those instances in which a facility or section of a facility provides psychiatric treatment to a person with mental illness *** it qualifies as a 'mental health facility' for purposes of the Mental Health Code's application." From this holding, it necessarily follows that where a person who suffers from both medical and psychiatric issues is admitted to the hospital, particularly where, as here, the person's psychiatric issues led to the medical problems which necessitated admission to the hospital, the admission to the hospital is, an "admission" to a mental health facility under the Mental Health Code. As the appellate court below recognized, to find otherwise would be to allow disparate treatment of persons suffering from mental illness based on their *physical health*—in other words, a person suffering from mental illness who is admitted to a traditional mental health facility for psychiatric treatment would be entitled to the rights and protections provided by the Mental Health Code, while a mentally ill person who is admitted to a nontraditional facility for psychiatric treatment in conjunction with medical care would not be afforded the same statutory safeguards.

¶ 100    The inescapable conclusion flowing from our decision in *Linda B.* is that an admission to a hospital for the delivery of both medical and psychiatric treatment— particularly where the psychiatric issues are the cause of the medical issue and are fully known to the hospital—is an admission to a mental health facility, subject to the requirements of the Mental Health Code and entitling the recipient to all the rights and protections provided by the Mental Health Code. The majority's holding

to the contrary leads to the extraordinary conclusion that the only protection available to a patient being detained against her will is the possibility of a lawsuit. See *supra* ¶ 53. How a mentally ill patient is supposed to have the capacity to file such a suit is never explained. The majority opinion is at odds with *Linda B.*, and common sense, and cannot be what the legislature intended.

¶ 101    Finding that respondent was "admitted under the Mental Health Code" at the time she entered Carle does not necessarily answer the question of whether the petition at issue here was untimely. A question remains regarding the "capacity in which respondent was admitted, *i.e.*, whether she was a voluntary or involuntary recipient of treatment" (*Linda B.*, 2017 IL 119392, ¶ 41), as well as which party bears the burden to show that an admission was voluntary or involuntary.

¶ 102    In *Linda B.*, we held that the respondent did not show that the petition for involuntary admission was untimely because it was her burden to present sufficient evidence to show that her admission and treatment were involuntary, which she had not done. However, we did not further consider in *Linda B.* the duty imposed on mental health facilities by the Mental Health Code to establish and document the type of admission—consensual, informal, voluntary, or involuntary—and to document any change in legal status.

¶ 103    The Mental Health Code places an obligation on mental health facilities to establish and document the nature of the recipient's admission. Thus, in this case, because an admission to a hospital for mental health treatment is equivalent to an admission to a traditional mental health facility, Carle was required to comply with the requirements of the Mental Health Code when respondent was admitted for treatment of her mental health condition. Respondent has met her burden in this case because she has shown that Carle failed to do so.

¶ 104    Carle alleges that respondent's treatment was provided pursuant to her "informed consent." However, whether respondent actually consented to treatment is not the issue. Carle had a responsibility under the Mental Health Code to document respondent's initial consent and any subsequent changes in her legal status due to a refusal of services or noncompliance. This burden is not unreasonable. No hospital would perform a medical procedure on a patient without first obtaining a signed form indicating the patient's consent to treatment. There is no reason why hospitals providing voluntary mental health services should not have

to obtain the recipient's written consent to mental health treatment upon their admission to the facility or at such time as the services commence. Such a requirement eliminates any question regarding respondent's legal status as a voluntary or involuntary recipient of mental health treatment.

¶ 105 In this case, the petition for involuntary inpatient admission to a mental health facility was untimely because the mental health facility failed to fulfill its duty, under the Mental Health Code, to ascertain and document the provision under which respondent was admitted and failed to document any changes in her status. Moreover, the record does not conclusively support the notion that respondent's initial admission was voluntary within the meaning of the Mental Health Code. From the moment she entered the hospital, respondent's care providers were aware of her mental illness and her propensity to harm herself by swallowing foreign objects. As a result, from the beginning, respondent's stay at Carle was very restrictive, not because of her medical condition but because of her mental condition. Respondent was under observation 24 hours a day, and she was not allowed to have any small objects for fear that she might try to swallow them. In addition, because she presented to the hospital as an attempted suicide, respondent was given an AMA designation and would not have been allowed to leave the hospital even if she wanted to. And even if her initial admission was voluntary, there was some evidence that respondent's status may have changed at some point during her stay at Carle, when she refused services and became noncompliant with her mental health treatment provider.

¶ 106 For the reasons stated above and contrary to the majority, I would reverse the judgment of the appellate court. Accordingly, I dissent.

¶ 107 JUSTICE NEVILLE joins in this dissent.