**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230207-U

Order filed October 23, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| DOUGLAS B. CHIRICO, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois. |
| | ) | |
| | ) | Appeal No. 3-23-0207 |
| v. | ) | Circuit No. 19-CH-840 |
| | ) | |
| ANELLA S. GENTILOZZI, | ) | The Honorable |
| | ) | Anne Therieau Hayes, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices Brennan and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   In an appeal in a civil lawsuit filed by one sibling against another sibling asserting a claim for a declaratory judgment to quiet title and other causes of action relating to three parcels of real property that the plaintiff sibling (plaintiff) had deeded to the defendant sibling (defendant) and work that plaintiff had performed for defendant, the appellate court found that (1) the trial court's bench trial ruling in favor of defendant on all four counts of plaintiff's fourth amended complaint was not against the manifest weight of the evidence and (2) plaintiff was not prejudiced by the trial court's grant in part of defendant's motion to strike portions of plaintiff's fourth amended complaint and some of the attachments thereto. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2 Plaintiff, Douglas B. Chirico, filed a civil lawsuit against his sister, defendant, Anella S. Gentilozzi, asserting a claim for a declaratory judgment to quiet title and other causes of action relating to three parcels of real property that plaintiff had deeded to defendant and work that plaintiff had performed for defendant. During pretrial proceedings, the trial court granted in part defendant's motion to strike portions of plaintiff's fourth amended complaint, the operative pleading in this case, and some of the attachments thereto. After a bench trial, the trial court ruled in defendant's favor on all four counts of the fourth amended complaint. Plaintiff appeals, arguing that the trial court erred in (1) ruling in defendant's favor after bench trial and (2) granting in part defendant's motion to strike. We affirm the trial court's judgment.

¶ 3                              I. BACKGROUND

¶ 4 Plaintiff and defendant are brother and sister. Plaintiff was 66 years old (at the time that the fourth amended complaint was filed) and lived in Naperville, Du Page County, Illinois. He had worked for several years in residential construction and had served, at times, as a general contractor in that field. Defendant was 57 years old (at the time that the fourth amended complaint was filed), lived in Michigan, and owned a home and a condominium or duplex property (condominium) in Michigan.

¶ 5 Prior to April 2019, plaintiff was the legal and/or beneficial owner of four real properties in Naperville, Illinois. All four properties were in residential neighborhoods, and each property was on a different street. The streets that the properties were located on were Emerald Drive (Emerald property), Redbud Drive (Redbud property), Radcliff Road (Radcliff property), and Brainard Street (Brainard property). The Emerald and Radcliff properties were vacant lots, at least during the time frame relevant to this appeal, and the Redbud and Brainard properties had

single family homes on them. Plaintiff used the Brainard property as his personal residence and held the other three properties as business or investment properties for possible redevelopment.

¶ 6　　　　In 2010, plaintiff borrowed $250,000 from a local bank. The loan was secured by a mortgage on the Brainard and Redbud properties and possibly the Radcliff property as well. At some point thereafter, plaintiff began having financial difficulties, was unable to pay his loan payments, and fell into default on his bank loan. As a result, the amount that plaintiff owed the bank grew to $350,000. During that period, plaintiff turned to defendant for help with his financial problems.

¶ 7　　　　In 2015, defendant paid approximately $17,000 to redeem the property taxes on the Radcliff property. In return for that loan from defendant, plaintiff executed a promissory note agreeing to repay the $17,000 amount to defendant with interest. The note was signed by plaintiff in November 2015 and was supposed to be repaid by plaintiff, in full, within approximately 11 months (by a specified date in October 2016). In addition, in May 2017, defendant paid approximately $251,000 to the bank to get plaintiff out of default on his bank loan, to prevent the bank from foreclosing on plaintiff's home (Brainard property), and to allow the bank to release the Redbud property (and possibly the Radcliff property) as additional collateral for plaintiff's bank debt. In return for that loan from defendant, plaintiff executed a promissory note agreeing to repay the $251,000 amount to defendant with interest. The note was signed by plaintiff in May 2017 and was supposed to be repaid by plaintiff in full within one year (by a specified date in May 2018). As security for the note, plaintiff executed two mortgages in defendant's favor that were recorded against the Redbud and Radcliff properties (one mortgage for each property). The principal amount of the debt secured was listed on each mortgage as $251,000. Plaintiff promised defendant that he would sell one (or more) of his investment

3

properties so that he could pay back the loan that defendant had given him and that he would reduce his list price on those properties every month until the properties were sold.

¶ 8    At the same time that plaintiff executed the note and mortgages for the $251,000 loan from defendant, plaintiff also executed a general durable power of attorney for property and financial matters, a will, and several other documents. The note, mortgages, and other documents were prepared by, or with the help of, the parties' brother, Tony Chirico, on a legal documents website. In the durable power of attorney, defendant and Tony were named as plaintiff's agents if plaintiff became incapacitated or unable to manage his financial affairs (as certified by plaintiff's doctor), which never occurred in this case. In the will, defendant was named as the executor of plaintiff's estate. Plaintiff chose defendant to be one of the agents in his power of attorney and the executor in his will because he trusted defendant.

¶ 9    In January 2018, defendant paid an additional amount (approximately $7500) on plaintiff's bank loan. Later that year, in May 2018, plaintiff began working for defendant, performing a major remodeling project on defendant's condominium property in Michigan. There were several phases to the project, and plaintiff basically served as the general contractor. Plaintiff worked on that project, off and on, for the next several months.

¶ 10    In about July 2018, plaintiff received an offer of $280,000 on the Emerald property. Plaintiff thought that the offer was well below market value and did not accept or respond to the offer. After defendant learned of the offer and of plaintiff's refusal to consider it, she sent a text message to plaintiff stating that his debt to her needed to be settled.

¶ 11    The parties' brother, Tony, was aware that defendant had loaned plaintiff a significant amount of money and that plaintiff had made no progress in selling the properties to satisfy his debt to defendant. Defendant and Tony had several conversations about the matter, and

4

defendant had expressed to Tony her frustration with plaintiff not selling the Emerald property and not paying her back. Tony thought that the offer plaintiff received for the Emerald property was a "great offer" and that the proposed purchase price was reasonable. As far as Tony knew, there had not been any offers on the property for years prior to that time. According to Tony, the whole situation with plaintiff and defendant was getting more serious by the month. The note that plaintiff had signed in defendant's favor had already come due, the time had passed for repayment, and there did not seem to be any progress on repayment or on plaintiff trying to sell his investment properties so that repayment could be made. In addition, there were tax sales and redemption periods looming that would have required defendant to invest even more money into plaintiff's properties. Tony believed that he and defendant had both come to the conclusion that if plaintiff was not going to seriously market the properties for sale, the only solution was to force plaintiff to satisfy his debt to defendant by giving her a deed in lieu of payment. Tony thought that defendant had proposed that idea to plaintiff and that plaintiff had agreed to do so.

¶ 12     In September 2018, defendant paid approximately $8400 on plaintiff's loan with the bank. In October 2018, defendant paid approximately $18,500 to redeem plaintiff's property taxes on the Redbud property.

¶ 13     In March 2019, plaintiff returned to Illinois after working for several months on the Michigan condominium project. Although plaintiff had planned to return to Michigan to continue working on the project, he never did so because the current dispute arose between the parties. After plaintiff returned to Illinois, he saw an email that defendant had previously sent to him that stated that his home (Brainard property) was going to be put up for a tax sale on April 9, 2019. In the email, defendant listed the amounts that she had paid out for plaintiff's properties over the past several years and indicated that the total amount that plaintiff owed her at that time,

5

not including interest, was approximately $301,600. Defendant stated further in the email that plaintiff needed to get his properties (presumably, the investment properties) sold or signed over to defendant because defendant needed her money. Plaintiff had not seen defendant's email prior to that time because he was having problems with his cell phone. Plaintiff went to the bank on April 2, 2019, to inquire because the property taxes on his home should have been paid out of the monthly mortgage payments. Plaintiff was informed at that time by the bank that the property was going to be put up for a mortgage foreclosure sale, not a tax sale, because the monthly mortgage payments had not been made.

¶ 14        The following day, on April 3, 2019, defendant went to plaintiff's home with a deed for the Redbud property and asked plaintiff to sign the Redbud property over to her. Defendant told plaintiff that he was going to lose his home—that his home was up for sheriff's sale on April 9, and that defendant was not going to make the mortgage payment (pay the mortgage arrearage) unless the Redbud deed was signed. Plaintiff agreed and, on his own initiative, made deeds for the other two investment properties and signed them over to defendant as well. Neither defendant nor plaintiff had an attorney present on April 3, when the deeds signing all three properties over to defendant were executed, but the attorney's office that later represented defendant in the court proceedings in this case had prepared the Redbud deed. At the time of the transfer, plaintiff told defendant that he was going to try to sell the Redbud property to Jerry Pokorny, a friend and occasional business partner of plaintiff. Defendant had no objection to plaintiff doing so or to plaintiff trying to sell the other two investment properties. A few days after the April 2019 transfer took place, defendant paid the arrearage of approximately $11,100 on plaintiff's bank loan as the parties had agreed. Defendant also paid approximately $12,200 to the county clerk for

6

the property taxes on the Radcliff property and recorded the deeds that plaintiff had signed transferring the Redbud and Radcliff properties to defendant.[1]

¶ 15    In May 2019, defendant listed all three properties for sale on the Multiple Listing Service. That same month, plaintiff had an attorney that he and defendant knew send a letter (plaintiff's attorney letter) to defendant asking defendant to give plaintiff a little more time to put together a contract to try to get things resolved (presumably, a contract to sell one or more of the investment properties to another party). Defendant responded shortly thereafter, acknowledged that plaintiff had transferred the three investment properties to her, and denied the attorney's request for plaintiff to receive additional time. In her response, defendant stated, among other things, that (1) "[t]he amounts owed collectively [on the properties] for mortgage loans, other liens, back taxes, expenses, legal fees, interest, [and] penalties [were] substantial and [were] on going [*sic*]," (2) whether the value of the properties was ultimately sufficient to satisfy the amounts due was speculative, (3) plaintiff had owned the properties for years and had many opportunities to sell the properties to satisfy his creditors but had refused to do so, (4) because of her willingness to help plaintiff, defendant had been placed in an extremely stressful and financially debilitating position and no longer had the luxury of time or the money to assist plaintiff, and (5) plaintiff had been paid in full for the work that he had done for defendant.

¶ 16    In July 2019, plaintiff filed the instant lawsuit against defendant in the trial court and recorded a *lis pendens* on all three investment properties, preventing the properties from being sold. Plaintiff's complaint, which was labeled a petition, was amended several times. Plaintiff's fourth amended complaint, the operative pleading in this case, was drafted by plaintiff when he

---

[1]There is no indication in the record on appeal whether defendant recorded the deed that plaintiff had signed transferring the Emerald property to her. At the time of the transfer, the Emerald property apparently had two recorded liens outstanding that totaled approximately $35,000.

was self-represented. It was 30 pages long, had over 300 pages of exhibits attached to it, and contained four counts. In count I of the fourth amended complaint, plaintiff sought a declaratory judgment to quiet title to the three investment properties. More specifically, in his request for relief on count I, plaintiff asked the trial court to void the deed transfers (the deeds transferring the three investment properties to defendant), to declare that the transfers were actually equitable mortgages securing a sum to be determined at trial, to restore sole title to the properties to plaintiff, to invalidate the title interests of any unknown owners or nonrecord claimants whose purported interests were dependent upon the validity of the deed transfers, and to "[award] such other relief as [was] equitable and just." In count II, which was filed as an alternative to count I, plaintiff sought to be awarded "equitable compensation" for the unjust enrichment of defendant that resulted from defendant's improper exercise of control over the three investment properties. In counts III and IV, plaintiff sought to be reimbursed, either under a breach of contract theory (count III) or a *quantum meruit* theory (count IV), for the work that he had performed on defendant's Michigan condominium property.

¶ 17       In September 2020, while the case was pending, the parties entered into a partial settlement agreement in the trial court to allow defendant to sell the Redbud property to a third party for $240,000. After the costs of the sale were taken out, the remaining proceeds from the sale were applied to plaintiff's debt and reduced the amount of money that plaintiff owed defendant.

¶ 18       In September 2022, over three years after the instant case was filed, the matter proceeded to a bench trial in the trial court. Plaintiff and defendant were both present in court for the trial. Plaintiff was initially self-represented when the trial started but eventually hired an attorney during the course of the trial and was represented for the latter part of the trial by his attorney.

8

Defendant was represented by an attorney the entire time. The trial took approximately six days to complete (including the final day when the trial court merely announced its ruling) over a period of several months.

¶ 19        During the trial, the parties presented the testimony of four witnesses: defendant (called as an adverse witness by plaintiff); plaintiff; the parties' brother, Tony; and plaintiff's friend and occasional business partner, Jerry Pokorny. The parties also presented stipulations as to some of the facts and admitted into evidence numerous exhibits, including the three deeds at issue (the deeds allegedly transferring the investment properties from plaintiff to defendant), the two notes and mortgages that plaintiff executed in defendant's favor, certain text messages and emails, and various other documents. Many of the underlying facts were not in dispute and have already been set forth above.

¶ 20        The disputed matters at trial involved three main subject areas: (1) the parties' intentions at the time of the April 2019 transfer and the circumstances surrounding the transfer, (2) the value of the three investment properties at the time of the transfer, and (3) the amount of reasonable compensation to which plaintiff was entitled for his work on defendant's Michigan condominium property. The evidence presented at the trial regarding those subject areas can be summarized as follows.

¶ 21        With regard to the first contested subject area—the parties' intentions and the circumstances surrounding the April 2019 transfer—defendant testified at the trial that she did not purchase the properties from plaintiff, that there was no purchase agreement, and that there was no price that she paid for the properties. After the transfer occurred, defendant considered herself to be the owner of the properties. The first time that defendant became aware that plaintiff did not believe that defendant had the authority to sell the properties was when

defendant received notice of the *lis pendens* that plaintiff had recorded. After the lawsuit was filed and the *lis pendens* was recorded, defendant could not do anything with the properties but still had to maintain the properties and pay the properties' expenses so that the properties would not be lost to a tax sale or anything else. That was why defendant continued to keep track of her expenses, even after the transfer. Defendant had not, however, paid the property taxes on the Radcliff or Emerald properties for the past three years (prior to trial) because she did not have the money available, had to pay her own property taxes, and had made a decision not to put any more money into the properties since she could not do anything with them.

¶ 22        Defendant also testified during the trial, however, that the deeds were not compensation for the debt; that none of the debt was satisfied, either in full or even partially, by the transfer of the three properties to defendant; and that none of the debt was forgiven on the transfer date. After the Redbud property was sold in September 2020 pursuant to a partial settlement agreement between the parties, defendant stopped adding interest to the $251,000 promissory note but did not record a satisfaction and release of the mortgage until three months later because there was still money that plaintiff owed defendant for expenses and interest. The $17,000 promissory note, though, was still in effect as of the date of defendant's trial testimony and was still accumulating interest.

¶ 23        When defendant was asked specifically on the witness stand if her understanding was that plaintiff gave her the deeds to the three properties in April 2019 so that she would have additional collateral for the money that plaintiff owed her, she responded that was not her understanding and that she did not need the deeds for collateral because she already had an interest with the signed promissory notes and mortgages. Defendant admitted, however, that she had made that statement about collateral in her deposition but also indicated that she had later

10

clarified that statement in the same deposition in a manner that was similar to her trial testimony—that the transfer of the three properties was intended to give her something more than what she already had and to allow her to list and sell the properties. After defendant received the three deeds, she intended to sell the properties so that she could reimburse herself for the money that plaintiff owed her. Any leftover funds, she was going to return to plaintiff.

¶ 24     Defendant did not recall plaintiff telling her at the time of the transfer to use a particular exemption on the transfer tax form that she would have to fill out for the transfer of the properties. Rather, defendant maintained, she was advised by a city employee who helped her fill out the transfer tax form to check a particular exemption box on the form. Defendant never sent plaintiff a notice of default or initiated foreclosure proceedings on the Redbud or Radcliff mortgages, but she told plaintiff multiple times that she needed to be paid back. In addition, defendant sent plaintiff an email, text message, or both, listing the amount of money that she had paid out on the properties. Defendant had also probably told plaintiff verbally what was owed.

¶ 25     On that same subject area—the parties' intentions and the circumstances surrounding the April 2019 transfer—plaintiff testified that defendant told him just prior to the transfer that she was not going to pay out any more money on plaintiff's properties because she was unsecured (or under-secured). Plaintiff took "unsecured" to mean that defendant had paid out almost $40,000 in additional funds above the amount of the promissory note. Plaintiff asked defendant if she would pay the cure amount on the bank loan if plaintiff signed over the Redbud property to defendant, and defendant responded that she would. Plaintiff told defendant that he wanted to put the other two properties in her name as well because he was trying to show defendant that he trusted her and that he hoped that defendant trusted him. Plaintiff advised defendant to select the "E" exemption on the state transfer tax form and told defendant that she would not have to pay

11

any transfer taxes because the three properties were being transferred to her as securities. The deeds that were later recorded showed that defendant had in fact selected the "E" exemption as to the state transfer taxes. Plaintiff acknowledged during his trial testimony, however, that he had not paid any expenses related to any of the three properties after the transfer took place in April 2019.

¶ 26     As further evidence that plaintiff did not intend to actually convey the properties to defendant, plaintiff testified that it was his practice over the years when he was working on construction projects with his business partners to put the real property that would be used for the projects into the partner's name alone (and not plaintiff's), unless plaintiff and the partner had set up a limited partnership. In one such project, for example, plaintiff and his business partner, Jerry Pokorny, owned the project lots for over 20 years, and, during that entire time period, the lots were held in Pokorny's name alone, a fact that Pokorny confirmed in his trial testimony as well.

¶ 27     With regard to the second contested subject area—the value of the three properties at the time of the transfer—defendant testified that she could guess or estimate that on the date of the April 2019 transfer, the Redbud property was worth $300,000 to $325,000, the Radcliff property was worth $225,000 to $245,000, and the Emerald property was worth $285,000. Defendant pointed out, however, that she was not an appraiser and was not qualified to give those estimates. Defendant stated further that although she testified as to the value of the properties during her deposition in January 2020 or 2021, she probably just guessed or estimated as to those values as well. According to defendant, she could not have possibly given an accurate value because she was not an appraiser, did not live in Illinois, and did not look at Illinois property values. At the time of her deposition, defendant's general idea was that the Redbud property was worth

12

$325,000, the Radcliff property was worth $225,000, and the Emerald property was worth $280,000, but that was just defendant's guess.

¶ 28    Defendant brought only a deed for the Redbud property with her to plaintiff's home on the date of the transfer in April 2019 because she thought at the time that the transfer of the Redbud property to her would satisfy the approximately $350,000 that plaintiff owed her. Defendant later wrote in her response to plaintiff's attorney letter that the value of the properties was speculative because she had no idea what the properties were worth. Nor did she have any idea as to how long it would take to sell the properties since plaintiff had been trying to sell the properties for several years but had not been able to do so.

¶ 29    As for plaintiff's evidence on that subject area—the value of the properties at the time of the April 2019 transfer—plaintiff primarily relied at trial upon the testimony of defendant to establish the value and did not provide an estimate in his own testimony as to what he believed the properties were worth at the time of the transfer. At one point during the trial, however, plaintiff did seek to question defendant about appraisals that had been conducted on all three properties in 2008, but defendant objected, and plaintiff withdrew his request. Plaintiff was able to testify, though, that Pokorny and another person had offered to purchase the Redbud property in July 2019 for $350,000 and Pokorny later confirmed that fact in his own testimony. After that date, plaintiff learned that defendant had already accepted an offer on the Redbud property, so he filed this lawsuit to prevent the properties from being sold.

¶ 30    Finally, with regard to the third contested subject area—plaintiff's compensation for the work he performed on the Michigan condominium property—defendant testified that she and plaintiff had discussed the matter and that her understanding was that the compensation would either be that plaintiff was working off the interest that he owed defendant or that defendant

13

would pay the mortgage payments on plaintiff's bank loan, one or the other. Defendant came to that understanding because plaintiff initially told defendant not to worry about paying him and that he could work off some of the interest that he owed her but later asked defendant if she could make his mortgage payments on the bank loan. Defendant took plaintiff's subsequent request as an either-or request and chose to pay the mortgage payments. Defendant had already paid six months of plaintiff's mortgage payments before plaintiff had even agreed or offered to work for defendant, and defendant assumed that plaintiff was referring to the mortgage payments that she had already paid. The parties never discussed an hourly rate that plaintiff would receive for his work and never agreed upon any particular amount of interest per month that plaintiff would be working off if plaintiff was to be paid in that manner.

¶ 31   According to defendant, plaintiff had done some work for her in approximately 2015 replacing the windows in her Michigan home after her husband had died. Although plaintiff did not want to be paid for the work, defendant snuck $3000 into plaintiff's suitcase.

¶ 32   As for the number of hours that plaintiff had worked on the condominium project, defendant testified that she did not keep a contemporaneous log and that she had to calculate plaintiff's hours after the fact. Defendant determined the number of days that plaintiff had worked by looking at her phone records and trying to find train receipts to indicate when plaintiff arrived in Michigan to work on the project and when he left. From those records, defendant calculated that plaintiff had worked on the project approximately 174 days or nearly 6 months. Defendant's calculation, however, included days that plaintiff was traveling, even though plaintiff may not have actually done any work on those days.

¶ 33   When defendant was asked about the total amount of compensation that plaintiff was paid for his work, she testified that plaintiff received approximately $14,600, which included

14

approximately $4400 in cash payments, $3000 for plaintiff's living expenses that were covered by defendant (defendant estimated the cost of living expenses as being $500 per month for the six-month period), and approximately $7500 that defendant had previously paid on plaintiff's bank loan before plaintiff started working on the project.[2]

¶ 34        As to that same subject area—the amount of compensation that plaintiff was supposed to receive for his work on the Michigan condominium property—plaintiff testified, on the other hand, that he and defendant had conversations on two occasions about the matter and that he believed that they had agreed that defendant would forgive the interest on the $251,000 promissory note and pay plaintiff's monthly mortgage payments to the bank on plaintiff's bank loan (presumably, while plaintiff was working on the project) as plaintiff's compensation. When plaintiff went to the bank on April 2, 2019, to inquire about what he thought was a scheduled tax sale of his home, he learned for the first time that defendant had not been paying the monthly mortgage payments to the bank as plaintiff thought the parties had agreed and that the property was actually scheduled for a mortgage foreclosure sale. According to plaintiff, the payment that defendant had made on the bank loan in January 2018 (approximately $7500) was not part of the parties' agreement on compensation and took place before the parties' agreement had been reached. In addition, defendant did not tell plaintiff at any time that she was prepaying him or had prepaid him for his work on the condominium property. Furthermore, it did not appear from the email or text message that defendant had sent that defendant had forgiven the interest on her loan to plaintiff for the period that plaintiff had worked on the condominium project as plaintiff thought the parties had also agreed. In other words, it did not appear that defendant had compensated plaintiff at all for his work. As for plaintiff's room and board while he worked on

---

[2]The amounts stated actually total approximately $14,900, rather than approximately $14,600.

15

the condominium property, plaintiff testified that the parties had never discussed the matter and that defendant had never charged plaintiff for room and board when he had done work for defendant in Michigan in the past.

¶ 35    Plaintiff acknowledged that he had stated in his prior deposition that he had told defendant all she had to do was pay his monthly interest payment and he would work as long as she wanted. According to plaintiff, however, that statement was not consistent with his memory of the actual conversation between him and defendant.

¶ 36    Like defendant, plaintiff did not keep a contemporaneous log of the number of hours he had worked on the condominium project and had to calculate the hours after the fact. To do so, plaintiff reviewed his travel and bank records and determined that he had worked approximately 216 days on the project, which did not include days that he was traveling. In addition, according to plaintiff, he generally worked over eight hours a day on the days that he worked on the project.

¶ 37    As for the hourly value of his work, plaintiff did not recall if he had submitted any type of bids for residential construction work within the past 5 or 10 years of when he had worked on defendant's Michigan condominium. Plaintiff noted, however, that defendant had paid other workers on the condominium project between $16 and $30 per hour and indicated, although somewhat implicitly, that in the prior work that plaintiff had done for defendant, defendant had paid plaintiff $3000 (defendant had snuck $3000 into plaintiff's suitcase) for the work that plaintiff had done replacing the windows on defendant's Michigan home, a project that took plaintiff approximately 21 hours to complete.

¶ 38    At the conclusion of the trial, after all of the evidence had been presented and the parties had submitted written closing arguments, the trial court found in favor of defendant on all four

counts of plaintiff's fourth amended complaint. In announcing its ruling, the trial court orally

provided a thorough explanation for its decision in defendant's favor on each of the counts.

Among other things, the trial court indicated that it had found that both defendant and plaintiff

were credible witnesses but noted that plaintiff appeared to have difficulty remembering things at

times.

¶ 39		Plaintiff appealed the trial court's judgment. He also sought in both the trial court and in

this court to stay the trial court's ruling, but his motions were denied.[3] Following the denial of

his motions, the Radcliff and Emerald properties were sold to non-related persons who were not

parties to this case.[4]

¶ 40				II. ANALYSIS

¶ 41		On appeal, plaintiff argues that the trial court erred in (1) ruling in defendant's favor after

bench trial on all four counts of plaintiff's fourth amended complaint and (2) granting in part

defendant's motion to strike portions of the fourth amended complaint and the attachments

thereto. We will address each of those arguments in turn.

¶ 42			A. The Trial Court's Ruling in Defendant's Favor After Bench Trial
		on Plaintiff's Equitable Mortgage Claim (Count I of the Fourth Amended Complaint)

¶ 43		As his first point of contention on appeal, plaintiff argues that the trial court erred in

ruling in defendant's favor after bench trial on plaintiff's equitable mortgage claim (also

described above as plaintiff's declaratory judgment to quiet title claim), count I of the fourth

---

[3]There is no clear indication in the record before us that plaintiff filed a motion to stay in the trial court. Plaintiff represented in the motion to stay that he had filed in this court, which was titled a motion for a preliminary injunction, that the trial court had denied his motion to stay the judgment. Defendant has not disputed that representation.

[4]As noted above, the Redbud property had been sold previously during the trial court proceedings pursuant to a partial settlement agreement between the parties.

17

amended complaint. In support of that argument, plaintiff asserts generally that he presented sufficient evidence to establish his claim of equitable mortgage and that the trial court's ruling to the contrary was against the manifest weight of the evidence. More specifically, plaintiff contends that the trial court's ruling was against the manifest weight of the evidence because the evidence presented at the bench trial showed that the parties intended for the three April 2019 deeds to serve merely as additional collateral for plaintiff's debt to defendant and not as actual conveyances of the three investment properties to defendant. Such a conclusion, plaintiff maintains, is supported by the evidence presented at the bench trial of the parties' intent and also by an analysis of all of the evidence presented under the case law factors used to determine whether a deed appearing to transfer real property is an actual conveyance or an equitable mortgage. In addition, plaintiff asserts, because the evidence presented at the bench trial showed that a fiduciary relationship existed between the parties, the trial court should have placed the burden on defendant to prove by clear and convincing evidence that the three April 2019 deeds were an actual conveyance of the properties to defendant and that the transfer was fair, equitable, and just to plaintiff. Defendant failed in that burden, according to plaintiff, and the trial court, therefore, should have ruled in plaintiff's favor on plaintiff's equitable mortgage claim. Thus, for all of the reasons stated, plaintiff asks that we reverse the trial court's ruling in favor of defendant on plaintiff's equitable mortgage claim (count I), that we enter judgment for plaintiff on that claim instead, and that we award plaintiff damages on that claim or remand for the trial court to hold a hearing on damages.

¶ 44　　　　Defendant argues that the trial court's ruling on plaintiff's equitable mortgage claim was proper and should be upheld. Defendant asserts that the trial court correctly found that plaintiff had failed to establish that the transfer of the three investment properties in this case was an

18

equitable mortgage and not an absolute conveyance. Defendant disagrees with plaintiff's contention that a fiduciary relationship existed between the parties and with plaintiff's related contention that the burden of proof should have been placed on defendant. In so doing, defendant maintains that plaintiff did not plead or argue a breach of fiduciary duty claim in the trial court. For that reason and for all of the other reasons set forth, defendant asks that we affirm the trial court's ruling in defendant's favor on plaintiff's equitable mortgage claim, count I of the fourth amended complaint.

¶ 45       Before we reach the merits of the parties' arguments on plaintiff's equitable mortgage claim, however, we must first address defendant's additional argument that plaintiff's assertions on that claim are moot and should not be ruled upon by this court. According to defendant, the mootness doctrine applies because plaintiff failed to obtain a stay of the trial court's judgment, the three investment properties were subsequently sold to third parties (the Redbud property was sold during the trial court proceedings pursuant to the parties' partial settlement agreement), and this court can no longer grant plaintiff the relief that he sought on the equitable mortgage claim (to regain title to the three investment properties). Furthermore, defendant maintains, although plaintiff now requests on appeal that he be awarded the proceeds from the sales of the properties, rather than title to the properties, he did not plead any type of monetary claim in count I of his fourth amended complaint.

¶ 46       In response to defendant's mootness argument, plaintiff does not dispute that he failed to obtain a stay of the trial court's judgment, that the three investment properties were subsequently sold to third parties, and that he can no longer be granted title to the three investment properties. Plaintiff maintains, however, as defendant notes above, that his assertions on the equitable mortgage claim are not moot because this court can still grant plaintiff effectual relief on that

19

claim by awarding plaintiff the proceeds from the subsequent sales of the properties. According to plaintiff, an award of the sales proceeds was included in his request for relief on the equitable mortgage claim when he requested to be awarded "such other relief as [was] equitable and just" and was recognized by the parties as an appropriate form of relief that could be provided to plaintiff when the parties agreed in their partial settlement agreement to apply a portion of the proceeds from the subsequent sale of the Redbud property to plaintiff's debt.

¶ 47    It is well settled that Illinois courts will generally not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided. See *In re Julie M.*, 2021 IL 125768, ¶ 21; *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990). An issue is moot when intervening events have made it impossible for the appellate court to grant the complaining party effectual relief. *Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1162-63 (2000).

¶ 48    Relevant to count I in the present case, it is also well settled that absent a stay, when the property that is the subject of an appeal is sold to a third party who is not a party to the litigation or a nominee thereof, the appeal is moot. See *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 532 (2001); *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 3; *Deutsche Bank National Trust Co. as Trustee for Indymac Indx Mortgage Loan Trust 2006-AR25 v. Roman*, 2019 IL App (1st) 171296, ¶ 21. In keeping with that principle, Illinois Supreme Court Rule 305(k), which addresses the effect that the failure to obtain a stay has on interests in property, provides, in pertinent part, that "[i]f a stay is not perfected within the time for filing the notice of appeal ***, the reversal or modification of the judgment does not affect the right, title, or interest of any person who is not a party to the action in or to any real or personal property that is acquired after the judgment becomes final and before the judgment is stayed[.]" Ill. S. Ct.

20

R. 305(k) (eff. July 1, 2017). The purpose of Rule 305(k) is to protect third-party purchasers of property from appellate reversals or modifications of judgment regarding the property, absent a stay of judgment pending the appeal. See *Steinbrecher*, 197 Ill. 2d at 523 (referring to a prior version of the rule in which the relevant provision was contained in subparagraph (j)).

¶ 49    After reviewing the facts in the present case and considering the legal principles set forth above, we agree with plaintiff that his assertions on count I are not moot. Contrary to defendant's argument on mootness, this court can still grant plaintiff effectual relief on count I by awarding plaintiff the proceeds from the subsequent sales of the investment properties, as plaintiff now requests. Although defendant is correct that plaintiff did not specifically request a monetary award in his prayer for relief on count I, plaintiff did make a general request for "such other relief as [was] equitable and just," and it is well established that a general prayer for relief is sufficient to warrant any judgment that is supported by the facts alleged in the complaint if those facts are proven by evidence. See *Fritzsche v. LaPlante*, 399 Ill. App. 3d 507, 522 (2010). We, therefore, reject defendant's mootness argument on plaintiff's equitable mortgage claim.

¶ 50    Turning to the merits of the parties' arguments on that claim, it is well settled that a trial court's ruling made after a bench trial will not be reversed on appeal unless it is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12; *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002); *Meyers v. Woods*, 374 Ill. App. 3d 440, 449 (2007). A ruling is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the ruling itself is unreasonable, arbitrary, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006); *Meyers*, 374 Ill. App. 3d at 449. Under the manifest weight standard, deference is given to the trial court as the finder of fact because the trial court is in a better position than the

21

reviewing court to observe the conduct and demeanor of the parties and witnesses. *Best*, 223 Ill. 2d at 350. A reviewing court, therefore, will not substitute its judgment for that of the trial court as to the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn from the evidence. *Id.* at 350-51.

¶ 51    The relevant statute in this case, section 5 of the Illinois Mortgage Act, provides that "[e]very deed conveying real estate, which shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage." 765 ILCS 905/5 (West 2018). As the language of the statute indicates, whether a deed should be considered to be an equitable mortgage depends upon the parties' intent. *Robinson v. Builders Supply & Lumber Co.*, 223 Ill. App. 3d 1007, 1014 (1991). To convert a deed that is absolute on its face into an equitable mortgage, the proof must be clear, satisfactory and convincing and may come from almost every conceivable fact that could legitimately aid that determination. *Id.* Some of the factors that a court may consider in determining whether a deed is actually an equitable mortgage include the existence of an indebtedness, the close relationship of the parties, prior unsuccessful attempts for loans, the circumstances surrounding the transaction, the disparity of the situations of the parties, the lack of legal assistance, the unusual type of sale, the inadequacy of consideration, the way the consideration was paid, the retention of written evidence of the debt, the belief that the debt remains unpaid, an agreement to repurchase, and the continued exercise of ownership privileges and responsibilities by the seller. *Id.* Each case, however, must be determined based upon its own unique facts. See *McGill v. Biggs*, 105 Ill. App. 3d 706, 708 (1982).

¶ 52    In the present case, after thoroughly reviewing the record, we conclude that the trial court's ruling in favor of defendant on plaintiff's equitable mortgage claim was amply supported

22

by the evidence presented at the bench trial. Consistent with the trial court's determination that the April 2019 transfer was an actual conveyance and not an equitable mortgage, defendant testified at the bench trial that she already held a security interest in the Redbud and Radcliff properties and that the purpose of the April 2019 transfer was to give her something more than what she already had—the ability to list and sell the properties. The only way that defendant would have had that ability, under the facts of the instant case, was if the April 2019 transfer was an actual conveyance of the properties to defendant.

¶ 53　　　In addition to defendant's specific testimony about the parties' intent, the more general evidence of the parties' intent, when analyzed under the case law factors, also supported a determination that the April 2019 transfer was an actual conveyance. The evidence presented at the bench trial showed that plaintiff was a sophisticated business person who had previously served as a general contractor, had redeveloped properties, and had experience with real estate transactions; that neither party was represented by an attorney or had an attorney present at the time of the transfer, although the Redbud deed was prepared by an attorney; that there was nothing unusual about the manner in which the transfer took place, even though defendant did put some pressure on plaintiff to satisfy the debt; that the parties did not have disparate situations as both parties were struggling with their own financial difficulties; that there was no agreement made at the time of transfer to give plaintiff the right to repurchase the properties; and that after the transfer took place, it was defendant—and not plaintiff—who took over or continued to exercise the rights and obligations of ownership of the properties. Thus, as demonstrated, many of the case law factors weighed in favor of finding that the April 2019 transfer was an actual conveyance of the properties to defendant and was not an equitable mortgage.

23

¶ 54        Although plaintiff asserted in the trial court and on appeal that a finding of an equitable mortgage was warranted because the consideration that defendant paid for the three investment properties was grossly lacking (along with other factors), plaintiff failed to establish the market value of the properties at the time of the transfer with competent evidence. Indeed, the primary evidence that plaintiff presented as to the value of the properties at the time of the transfer was the estimates or guesses as to value that were stated by defendant in her trial and deposition testimony. That evidence, however, was mere speculation and was properly given no weight by the trial court. See Michael H. Graham, Graham's Handbook of Illinois Evidence § 701.3 (2021 ed.) (describing when a lay witness's opinion testimony as to the value of real estate may be admitted). In addition, while plaintiff asserted that an equitable mortgage was further indicated by the fact that defendant continued to keep track of her expenses for the properties after the April 2019 transfer occurred, the evidence presented at the bench trial also showed that defendant was essentially required to do so because she was faced with the uncertainty of the pending lawsuit, was unable to sell the properties due to the lawsuit and *lis pendens*, and was stuck with the continuing obligation of having to pay the properties' expenses to protect any interest that she had in the properties until the lawsuit was resolved.

¶ 55        In sum, based upon all of the evidence presented at the bench trial and the applicable standard of review, we conclude that the trial court properly ruled in defendant's favor on plaintiff's equitable mortgage claim, count I of the fourth amended complaint. We, therefore, affirm the trial court's ruling in defendant's favor on that claim. In reaching that conclusion, we are mindful that, as is often the case with trials, some of the evidence presented at the bench trial in this case did, in fact, support plaintiff's position—that the April 2019 transfer was an equitable mortgage. However, it was the province of the trial court as the trier of fact, and not this court, to

24

weigh the conflicting evidence, to determine the credibility of the witnesses, and to decide the issues presented. See *Washington v. Williams*, 215 Ill. App. 3d 607, 610 (1991). Although the trial court in this case found that both plaintiff and defendant were credible witnesses, it also found that plaintiff had difficulty remembering things—another finding that supported the trial court's ruling in favor of defendant on plaintiff's equitable mortgage claim.

¶ 56 As a final matter on this issue, we reject plaintiff's assertion that the trial court erred in failing to find that a fiduciary relationship existed in this case between defendant and plaintiff and that defendant, therefore, should have had the burden to prove that the April 2019 transfer was fair, equitable, and just—a finding that would have essentially placed the burden on defendant to establish the value of the properties at the time of the transfer and to show that the value did not disproportionately exceed the debt that plaintiff owed defendant. As the party asserting a fiduciary relationship that did not arise by operation of law, plaintiff bore the burden to prove that such a relationship existed by clear and convincing evidence. See *Pottinger v. Pottinger*, 238 Ill. App. 3d 908, 917 (1992). The trial court's somewhat implicit finding that plaintiff had failed in that burden was sufficiently supported by the evidence. "The existence of a blood relationship [citations] or friendship does not of itself establish a fiduciary relationship; nor does one person's assistance of another in business affairs." *Id.* at 918. In addition, "trust and confidence are not enough to create a fiduciary relationship; superiority and influence must result from the trust and confidence." (Emphasis omitted.) *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 22. The record in the present case showed that plaintiff was a sophisticated businessperson who developed real properties and was familiar with real estate transactions and that defendant and plaintiff were essentially on equal footing with both having financial problems. The fact that defendant paid some of plaintiff's obligations because plaintiff could not

25

afford to do so did not create a fiduciary relationship between the parties. See *Pottinger*, 238 Ill. App. 3d at 917; *Tummelson*, 2015 IL App (4th) 150151, ¶ 22.

¶ 57          B. The Trial Court's Ruling in Defendant's Favor After Bench Trial
          on Plaintiff's Unjust Enrichment Claim (Count II of the Fourth Amended Complaint)

¶ 58          As his second point of contention on appeal, plaintiff argues that the trial court erred in ruling in defendant's favor after bench trial on plaintiff's unjust enrichment claim (pled in the alternative to plaintiff's equitable mortgage claim), count II of the fourth amended complaint. From a general standpoint, as with his equitable mortgage claim, plaintiff asserts that he presented sufficient evidence to prove his claim of unjust enrichment and that the trial court's ruling to the contrary was against the manifest weight of the evidence. In more specific terms, plaintiff contends that the trial court's ruling was against the manifest weight of the evidence because the evidence presented at the bench trial showed that (1) the market value of the three investment properties at the time of the April 2019 transfer was well above the amount that defendant was owed, (2) defendant was aware of the value of the properties at the time and knew that she had not paid any consideration for the deeds to the Radcliff and Emerald properties, and (3) it would be unconscionable under the circumstances to allow defendant to keep the entire proceeds from the sales.[5] Plaintiff asks, therefore, that we reverse the trial court's ruling in favor of defendant on plaintiff's unjust enrichment claim (count II), that we enter judgment for plaintiff on that claim instead, and that we award plaintiff damages on that claim or remand for the trial court to hold a hearing on damages.

---

[5]As to this claim and his other claims, plaintiff maintains his assertion that the evidence showed that a fiduciary relationship existed between the parties and that the burden of proof, therefore, should have been on defendant to establish that what occurred (the transfer of the properties or the amount that plaintiff was compensated for his work) was fair, equitable, and just to plaintiff. Because we have already rejected plaintiff's assertion in that regard, we will not address it further in this order.

26

¶ 59 Defendant argues that the trial court's ruling on plaintiff's unjust enrichment claim was proper and should be upheld. Defendant asserts that the trial court correctly found in defendant's favor on that claim because the evidence presented at the bench trial showed that (1) the parties had reached an agreement that plaintiff would transfer the investment properties to defendant to satisfy plaintiff's debt to defendant, (2) plaintiff had previously promised to sell the properties so that he could pay defendant back but had failed to do so, (3) transferring the properties to defendant would allow defendant to sell the properties to get her money back, and (4) there was nothing unjust or inequitable about the transfer. In addition, defendant maintains, plaintiff failed to prove that there was a significant difference between the value of the properties at the time of the transfer and the amount of money that plaintiff owed defendant. For those reasons, defendant asks that we affirm the trial court's ruling in defendant's favor on plaintiff's unjust enrichment claim, count II of the fourth amended complaint.

¶ 60 As indicated previously, a trial court's ruling made after bench trial will not be reversed on appeal unless it is against the manifest weight of the evidence. *Arredondo*, 2011 IL 111871, ¶ 12; *Eychaner*, 202 Ill. 2d at 251; *Meyers*, 374 Ill. App. 3d at 449. "The doctrine of unjust enrichment underlies a number of legal and equitable actions and remedies, including the equitable remedy of constructive trust and the legal actions of assumpsit and restitution or quasi-contract." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989). The doctrine is based upon the principle that no person ought to enrich himself unjustly at the expense of another. *Nesby v. Country Mutual Insurance Co.*, 346 Ill. App. 3d 564, 566-67 (2004). To prevail on a claim of unjust enrichment, a plaintiff must prove the following two elements: (1) that the defendant has unjustly retained a benefit to the plaintiff's detriment, and

27

(2) that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. See *HPI Health Care Services, Inc.*, 131 Ill. 2d at 160.

¶ 61        In the instant case, after reviewing the evidence presented at the bench trial, we conclude that the trial court's ruling in defendant's favor on plaintiff's unjust enrichment claim was well supported by the evidence. We reach that conclusion for two main reasons. First, as noted in our discussion of the trial court's ruling on plaintiff's equitable mortgage claim, the trial court properly determined that the parties had intended for the April 2019 transfer to be an actual conveyance of the three investment properties to defendant and not to merely serve as additional security for plaintiff's debt to defendant. Thus, it cannot be found that defendant unjustly retained the proceeds of the subsequent sales of the three investment properties since, at the time of the subsequent sales, defendant was the rightful owner of the properties pursuant to the April 2019 transfer. Second, as the trial court noted, plaintiff failed to present competent evidence to establish the value of the properties at the time of the April 2019 transfer so as to show that the value exceeded the amount that plaintiff owed defendant and to show that allowing defendant to keep the proceeds of the subsequent sales would violate the fundamental principles of justice, equity, and good conscience. As noted above, the primary evidence that plaintiff presented as to the value of the properties at the time of the transfer was the estimates or guesses as to value that defendant stated in her trial and deposition testimony. That evidence, however, was merely speculation, as the trial court noted. In addition, although plaintiff requested that we take judicial notice of the subsequent sales amounts, we decline to do so here as those amounts were not before the trial court when it made its ruling (other than the amount of the subsequent sale of the Redbud property, which was allowed pursuant to a partial settlement agreement between the parties) and no evidence was presented in the trial court to link those amounts to the value of the

28

properties at the time of the April 2019 transfer or to show the amount of the net proceeds that remained after the costs of the subsequent sales and any outstanding liens were deducted. We, therefore, affirm the trial court's ruling in defendant's favor on plaintiff's unjust enrichment claim, count II of the fourth amended complaint.

¶ 62　　　　　　　C. The Trial Court's Ruling in Defendant's Favor After Bench Trial
on Plaintiff's Breach of Contract Claim (Count III of the Fourth Amended Complaint)

¶ 63　　　　As his third point of contention on appeal, plaintiff argues that the trial court erred in ruling in defendant's favor after bench trial on plaintiff's breach of contract claim, count III of the fourth amended complaint. In general, as with his prior claims, plaintiff asserts that he presented sufficient evidence to prove his claim of breach of contract and that the trial court's ruling to the contrary was against the manifest weight of the evidence. More specifically, plaintiff contends that the trial court's ruling was against the manifest weight of the evidence because the evidence presented at the bench trial showed that (1) plaintiff and defendant had entered into an oral contract regarding the Michigan condominium project, (2) pursuant to the parties' agreement, plaintiff was to work as the general contractor on the project and defendant was to compensate plaintiff for his work by paying the monthly payments to the bank on plaintiff's bank loan and by waiving the interest that defendant was supposed to receive on the 2017 note (presumably while plaintiff was working on the project as to both), (3) plaintiff performed the work as required, (4) defendant accepted the work, (5) defendant breached the parties' contract by failing to fully compensate plaintiff for the work, and (6) plaintiff sustained damages as the result of defendant's breach. Plaintiff asks, therefore, that we reverse the trial court's ruling in favor of defendant on plaintiff's breach of contract claim (count III), that we enter judgment for plaintiff on that claim instead, and that we award plaintiff damages on that claim or remand for the trial court to hold a hearing on damages.

29

¶ 64        Defendant argues that the trial court's ruling on plaintiff's breach of contract claim was proper and should be upheld. Defendant asserts that the trial court correctly found in defendant's favor on that claim because plaintiff failed to show that defendant had breached the parties' agreement on the condominium project and failed to provide any competent evidence of damages. Defendant asks, therefore, that we affirm the trial court's ruling in defendant's favor on plaintiff's breach of contract claim, count III of the fourth amended complaint.

¶ 65        As noted above, a trial court's ruling made after bench trial will not be reversed on appeal unless it is against the manifest weight of the evidence. *Arredondo*, 2011 IL 111871, ¶ 12; *Eychaner*, 202 Ill. 2d at 251; *Meyers*, 374 Ill. App. 3d at 449. To sustain a cause of action for breach of contract, whether written or oral, a plaintiff must prove the following four elements: (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages or injury to the plaintiff caused by the breach. See *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28; *Lindy Lu LLC v. Illinois Central R.R. Co.*, 2013 IL App (3d) 120337, ¶ 21; *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 68. For a valid contract to exist, there must be an offer, acceptance, consideration, and contractual terms that are valid and certain. *Lindy Lu LLC*, 2013 IL App (3d) 120337, ¶ 21.

¶ 66        In the present case, upon reviewing the evidence presented at the bench trial, we conclude that the trial court's ruling in defendant's favor on plaintiff's breach of contract claim was sufficiently supported by the evidence. Contrary to plaintiff's assertions on appeal and despite the fact that plaintiff and defendant both testified at trial that the parties had entered into an agreement on the condominium project, the evidence presented at the bench trial showed that the parties had never reached a meeting of the minds on the specific compensation that plaintiff

30

would receive (whether defendant was supposed to pay plaintiff's monthly bank loan payment or forgive the interest on plaintiff's 2017 note or both) or on the length of the proposed agreement (the estimated amount of time that it would take to complete the project and that each party's obligations under the agreement would last). Thus, even when we consider whether the parties' dealings could have given rise to a very simple oral contract whereby plaintiff agreed to serve as the general contractor on the condominium project and defendant, in return, agreed to pay plaintiff compensation, we still have to uphold the trial court's ruling because the evidence presented showed that the parties never reached a meeting of the minds on even the most basic terms. In addition, beyond the basic terms, the evidence presented at the bench trial also showed that the parties had never discussed, or even considered, many of the essential matters, such as the number of hours per day, days per week, and weeks per month that plaintiff would work; whether plaintiff would be compensated based upon an hourly wage or the job as a whole; what the amount of plaintiff's hourly wage would be, if an hourly wage was going to be used; and whether room and board would be considered as part of plaintiff's compensation.

¶ 67 Moreover, as the trial court noted, even if a valid contract existed and it was breached, plaintiff failed to prove damages. Indeed, plaintiff did not establish with any certainty in this case the specific number of hours or days that he worked on the condominium project or the amount of hourly compensation that he was supposed to be paid. Although plaintiff tried on appeal to use the number of days suggested by defendant as a minimum baseline for the number of days that plaintiff worked, that information lacked specificity because it included days that plaintiff was traveling and may not have been working and there was no evidence provided as to the number of travel days in that figure or as to the specific amount of hours that plaintiff worked per day (plaintiff gave only a general estimate in his testimony). Furthermore, while plaintiff sought to

31

use the amount that he was paid for replacing the windows in defendant's home (the prior project) as a basis to establish the reasonable hourly value of his work, such an inference could not be drawn here because there was no evidence presented in the bench trial as to whether defendant paid plaintiff on an hourly basis for his work on the windows, whether defendant knew the number of hours that plaintiff had worked on that project, or whether the $3000 that defendant had snuck into plaintiff's suitcase at the time was meant to be reasonable compensation for the work or was a merely a sister giving money to her brother to help her brother with his financial problems. We must conclude, therefore, that the trial court's ruling in defendant's favor on plaintiff's breach of contract claim (count III of the fourth amended complaint) was not against the manifest weight of the evidence, and we affirm the trial court's ruling on that claim.

¶ 68        D. The Trial Court's Ruling in Defendant's Favor After Bench Trial
        on Plaintiff's *Quantum Meruit* Claim (Count IV of the Fourth Amended Complaint)

¶ 69        As his fourth point of contention on appeal, plaintiff argues that the trial court erred in ruling in defendant's favor after bench trial on plaintiff's *quantum meruit* claim (pled in the alternative to plaintiff's breach of contract claim), count IV of the fourth amended complaint. In general terms, as with his other claims, plaintiff asserts that he presented sufficient evidence to prove his claim of *quantum meruit* and that the trial court's ruling to the contrary was against the manifest weight of the evidence. In more specific terms, plaintiff contends that the trial court's ruling was against the manifest weight of the evidence because the evidence presented at the bench trial showed that plaintiff performed a service for defendant (the construction work on the condominium project), plaintiff did not perform that work gratuitously, defendant accepted plaintiff's work, there was no oral or written contract between the parties (based upon the trial court's ruling on plaintiff's breach of contract claim), and plaintiff was not fully and fairly

32

compensated for his work. Plaintiff asks, therefore, that we reverse the trial court's ruling in favor of defendant on plaintiff's *quantum meruit* claim (count IV), that we enter judgment for plaintiff on that claim instead, and that we award plaintiff damages on that claim or remand for the trial court to hold a hearing on damages.

¶ 70 Defendant argues that the trial court's ruling on plaintiff's *quantum meruit* claim was proper and should be upheld. Defendant asserts that the trial court correctly found in defendant's favor on that claim because plaintiff failed at the bench trial to present competent evidence to establish the value of the work that he had performed on the condominium project and also to establish that he was not fully compensated for his work, as plaintiff was required to prove to prevail on his *quantum meruit* claim. Defendant asks, therefore, that we affirm the trial court's ruling in defendant's favor on plaintiff's *quantum meruit* claim, count four of plaintiff's fourth amended complaint.

¶ 71 As indicated previously, a trial court's ruling made after bench trial will not be reversed on appeal unless it is against the manifest weight of the evidence. *Arredondo*, 2011 IL 111871, ¶ 12; *Eychaner*, 202 Ill. 2d at 251; *Meyers*, 374 Ill. App. 3d at 449. The phrase, *quantum meruit*, means "as much as he deserves" and is used to describe a cause of action brought to recover the reasonable value of services, which have been nongratuitously rendered, but where no contract exists to prescribe exactly how much the renderer of the services should have been paid. See *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365 (1997); *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010); Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011). "*Quantum meruit* is used as an equitable remedy to provide restitution for unjust enrichment and is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff may recover even if the

contract is unenforceable." *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 522 (2009). To prevail on a *quantum meruit* claim, a plaintiff must prove the following six elements: (1) that the plaintiff performed a service or services, (2) that the benefit of those services was conferred upon the defendant, (3) that the plaintiff did not perform those services gratuitously, (4) that the defendant accepted the services, (5) that no contract existed to prescribe payment for the services, and (6) that it would be unjust for defendant to retain the benefit of the services without compensation to the plaintiff. See *First National Bank of Springfield*, 179 Ill. 2d at 365; *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 31. The normal measure of damages for a *quantum meruit* claim is the reasonable value of the services the renderer performed. *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 606 (1999).

¶ 72　　　　In the instant case, after reviewing the record, we conclude that the trial court's ruling in defendant's favor on plaintiff's *quantum meruit* claim was amply supported by the evidence presented at the bench trial. As indicated in our analysis of plaintiff's breach of contract claim, plaintiff failed to establish with any certainty the number of hours or days that he worked on the condominium project or the reasonable hourly compensation that he should have been paid. In addition, because plaintiff failed to establish the reasonable value of his work on the project, he could not show that the compensation he received (in the form of cash payments, loan payments, and room and board) was not sufficient to fully and fairly compensate him for his work. We conclude, therefore, that the trial court's ruling in defendant's favor on plaintiff's *quantum meruit* claim (count IV of the fourth amended complaint) was not against the manifest weight of the evidence, and we affirm the trial court's ruling on that claim.

34

¶ 73        E. The Trial Court's Grant in Part of Defendant's Motion to Strike
        Portions of Plaintiff's Fourth Amended Complaint and the Attachments Thereto

¶ 74        As his fifth and final point of contention on appeal, plaintiff argues that the trial court

erred in granting in part defendant's motion to strike portions of plaintiff's fourth amended

complaint and the attachments thereto. As defendant correctly notes, however, there is no

indication from the record before us that plaintiff was in any way prevented from presenting his

evidence, claims, or legal theories as a result of the trial court's ruling. Indeed, plaintiff did not

even set forth a request for relief under this particular issue. We, therefore, decline to make a

ruling upon this issue as doing so would constitute nothing more than an advisory opinion. See

*Julie M.*, 2021 IL 125768, ¶ 21 (recognizing that Illinois courts will generally not decide moot

questions, render advisory opinions, or consider issues where the result will not be affected

regardless of how those issues are decided); *Barth*, 139 Ill. 2d at 419 (same).

¶ 75                            III. CONCLUSION

¶ 76        For the foregoing reasons, we affirm the judgment of the circuit court of Du Page

County.

¶ 77        Affirmed.